# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CARRIE BRAUN, | ) | CASE NO.  5:12-cv-01635 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| ULTIMATE JETCHARTERS, INC., | ) | |
| et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This matter is before the Court upon defendants' motion for summary judgment. That motion appears in the guise of a preliminary motion for summary judgment (Doc. No. 30), a memorandum in support (Doc. No. 31), and an amended supplement to the memorandum in support (Doc. No. 35). Plaintiff has filed an opposition. (Doc. No. 44.) Defendants filed a reply, possessed of certain procedural shortcomings, the details of which, and the motion practice touched off thereby, will be explained *infra*. For the following reasons, defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

Defendant Ultimate Jetcharters, Inc. ("UJC") is a corporation in the business of flying cargo and charter passengers across the country and internationally. (Doc. No. 35-1, Gordon Aff. ¶ 2.) Plaintiff Carrie Braun ("plaintiff" or "Ms. Braun") was hired by UJC on or about April 21, 2011 to be a co-pilot. (Gordon Aff. ¶ 3.) Defendants Robert "Bob" Rossi ("Rossi") and Floyd "Burt" Wells ("Wells") worked at UJC in the roles of both captain and command pilot. (Doc. No. 35-2, Rossi Aff. ¶ 3; Doc. No. 35-5, Wells Aff. ¶ 3.)

The following background is based upon plaintiff's characterization of events. When plaintiff was hired by UJC, she was told she would be their first female pilot. (Doc. No. 44-4, Braun Dep. at 62:1–2.) Shortly after she was hired, she was told by Dave Parsons ("Parsons"), UJC's director of operations, and Rod Eby ("Eby"), UJC's chief pilot, that she needed to "watch her back around certain . . . male pilots" and staff, specifically Rossi and Wells. (Braun Dep. at 62:22–63:1.) They also told her that UJC was "a very good ol' boys' network" that was "not so forward-thinking," and that "it was inconceivable to most people that there would have been a female pilot there." (Braun Dep. at 63:1–11.)

Ms. Braun claims to have first experienced sexual harassment during an initial phase of her training. (Braun Dep. at 75:24–76:7.) While going over the dress code and noticing that there was not a dress code for female pilots, Eby joked that plaintiff could "just follow the flight attendant dress code." (Braun Dep. at 76:8–15.) Plaintiff found it "very derogatory" that she was compared to a flight attendant, who "can walk in off the street" and perform their job with "no training at all." (Braun Dep. at 64:15–24.) When plaintiff adhered to the flight attendant dress code, unidentified male UJC employees "would constantly harass Plaintiff about how she was 'filling out her uniform better' and how she could 'give [Rossi] and [Wells] a heart attack' because of the way she looked in her uniform." (Doc. No. 31-4, Pl.'s Resp. to Defs' First Set of Interrogs., at 242.) Rossi and Wells also criticized plaintiff for creating unsafe conditions by wearing two-inch heels. (Braun Dep. at 64:3–5; 65:20–24.) When plaintiff reported their complaints to Parsons and Eby, they told her not to worry about those "good ol' boys." (Braun Dep. at 66:18–21; 67:3–11.) In a later conversation, Parsons joked to Ms. Braun about how offended Rossi and Wells would be if her uniform were "a thong and a cape and some six-inch

stilettos," a joke plaintiff felt was made to ridicule Rossi's and Wells's overreaction to plaintiff's uniform, but also to "cut" and "degrade" her. (Braun Dep. at 68:3–70:6.)

Also at training, UJC's safety director, Joe Maguire ("Maguire"), made comments about "how he would rather fly with a guy any day of the week even though [plaintiff] was more proficient than most of the male pilots[.]" (Braun Dep. at 251:12–21.)

In general, plaintiff contends that Wells was also prone to telling offensive jokes, particularly about female pilots and flight attendants. (Braun Dep. at 139:22–23.) Plaintiff remembered his "favorite one," which he told "probably ten" times:

> Q: What's the difference between the way a schoolteacher, a flight attendant, and a nurse have sex?
>
> A: The schoolteacher says, you're going to do this until you get it right. The nurse says, don't worry, this won't hurt a bit, and the flight attendant says, put this over your nose and mouth and breathe normally.

(Braun Dep. at 140:1–17.) Plaintiff found these to be "very crass, off-color jokes that were highly inappropriate." (Braun Dep. at 139:24–25.)

In or around May 2011, Rossi and Wells began exhibiting the tendency to "delv[e] into [plaintiff's] personal life more than they should have," asking her about why she was not married and why she did not want to settle down and have children. (Braun Dep. at 80:25–81:6.) Ms. Braun believed these comments about "settling down" were to try and induce her to leave UJC, even though they agreed that she had "d[one] a good job." (Braun Dep. at 86:6–87:23.)

Soon, Rossi and Wells began commenting to other captains and flight attendants that plaintiff was "unprofessional," "insubordinate," and "wild." (Braun Dep. at 89:2–17.) Plaintiff thought that these were threats that indicated that Rossi and Wells were "coming for

3

[her] . . . gunning for [her]." (Braun Dep. at 89:19–24.) She was concerned, in part, because she was told that Rossi and Wells would get her fired if they did not like her. (Braun Dep. at 93:21–24.)

Other male UJC employees also began mistreating plaintiff at about this time. Around May or June of 2011, Jeff Vazzo ("Vazzo"), another pilot, "made several advances" toward plaintiff, which she declined. (Braun Dep. at 95:21–96:9.) After plaintiff rebuffed him, Vazzo began spreading rumors about her among Rossi, Wells, and other crewmembers, including that plaintiff was "wild" and "inappropriate on the road," and that she "drank too much." (Braun Dep. at 102:18–103:23.) Another UJC pilot, Eric White, sent plaintiff messages via text and Facebook, along the lines of "hey, sexy, what's up," and asked plaintiff when they were going to "hang out." (Braun Dep. at 169:9–170:17.) White's messages were "of a sexual nature," and plaintiff did not reciprocate, but she also did not complain to anyone about them or block White from her Facebook page. (Braun Dep. at 175:16–176:19.)

Next, in October 2011, plaintiff was assigned to a flight in Canada with Rossi. (Braun Dep. at 185:4–5; 186:16–17.) They got into a disagreement about assigning radio frequencies to different radios, and Rossi began screaming at her, telling her she was "insubordinate" and that "he knows all about [her] past and he knows why [she's] single and . . . that he's going to get [her] fired." (Braun Dep. at 188:25–190:22.) Plaintiff walked from the cockpit back into the body of the aircraft, and Rossi followed her, continuing to scream insults and threaten to have her fired for twenty minutes. (Braun Dep. at 190:23–191:12.) When plaintiff approached Rossi shortly thereafter to try and "calm the situation down," he began screaming and yelling at her again. (Braun Dep. at 192:6–193:9.) Rossi was so angry—standing over her,

4

sticking his finger in her face—that plaintiff thought he was going to physically strike her. (Braun Dep. at 193:14–195:1.) After the flight, plaintiff reported Rossi's behavior to Parsons, who agreed that it was "uncalled for and . . . unprofessional." (Braun Dep. at 208:6–15.) Plaintiff also claims that "none of the flight attendants like to work with [Rossi] because he has a problem with women[,]" and that "he treats women like they're the scum on the bottom of his shoe[.]" (Braun Dep. at 242:14–20.)

Prior to their next flight, Rossi again began screaming at plaintiff after perceiving that plaintiff had disobeyed his orders to monitor the refueling of the plane. (Braun Dep. at 217:3–218:16.) Again, plaintiff reported Rossi's tirade to Parsons, who said he was "going to split up [her] and [Rossi] and not to worry about it," and that she would be promoted to captain, likely in March or April 2012. (Braun Dep. at 219:9–220:16.) At the same time, Rossi continued to tell other captains that plaintiff was insubordinate and unprofessional in an attempt to get her fired. (Braun Dep. at 221:8–224:2.) Once again, plaintiff spoke to Parsons about how Rossi and Wells "were out for [her]," and once again, Parsons took plaintiff's side and told her not to worry, that UJC "know[s] how they are," and that her job was "fine." (Braun Dep. at 224:17–225:6.) Despite her discussions with Parsons, Rossi and Wells continued to speak ill of her to others at UJC. (Braun Dep. at 226:21–25.)

In late 2011 or early 2012, plaintiff was asked to assist a police officer named John Catena ("Catena") in writing a security protocol on counter-terrorism and counter-skyjacking. (Braun Dep. at 163:11–164:4; 164:25–165:1.) When it came time to train employees in a group setting on the new security measures, Catena and Rossi openly mocked Ms. Braun repeatedly. (Braun Dep. at 164:18–23.) Catena also made "demeaning remarks" about women,

declaring that they "can't teach" most women self-defense training because "they don't really get it." (Braun Dep. at 178:7–19.) Additionally, around that time, Catena had "made advances" toward plaintiff and invited her up to his hotel room, but plaintiff refused. (Braun Dep. at 168:13–16.)

In February 2012, plaintiff discovered that Rossi had been making similar comments to employees at another flight company, calling her "insubordinate," "unprofessional," and "a wild girl." (Braun Dep. at 154:13–155:14; 231:15–234:1.) Once she discovered that remarks were being made to people outside the company, plaintiff called Parsons and told him she was experiencing "harassment" and "discrimination" and that she would not continue to "put[] up with this." (Braun Dep. at 155:15–20.) Parsons agreed that the way plaintiff was being treated was "wrong" and pledged to "put a stop to" it. (Braun Dep. at 156:5–8.) He also asked plaintiff to document all of Rossi's and Wells's behavior in an email, which other captains told her was "a surefire way to get fired" because John Gordon ("Gordon"), UJC's President and CEO, would take their side. (Braun Dep. at 234:22–237:5.) Plaintiff contends that it "is common knowledge within [UJC]" that Gordon is sexist, and that he "has been known to make . . . sexist jokes and comments all the time." (Braun Dep. at 251:5–11.) Ultimately, on February 20, 2012, plaintiff sent an email to Rossi, which she forwarded to Parsons, indicating that she was not going to stand for Rossi's and Wells's behavior any longer. (Braun Dep. at 237:6–20; Doc. No. 44–3.)[1] Two weeks went by without a response from Rossi, at which point

---

[1] Plaintiff's deposition testimony and opposition brief states that the email was written to both Rossi and Wells, but only Rossi appears as an addressee on the email. (Doc. No. 44–3 at 414.)

plaintiff had another conversation with Parsons, where he made another mention of her upcoming promotion. (Braun Dep. at 242:23–243:6.)

On March 12, 2012, approximately four weeks after she emailed Rossi,[2] Gordon called plaintiff and advised her that she was being fired for sending "inappropriate e-mails, plural," as well as for off-duty conduct on the road that was "not in line with [UJC]'s image." (Braun Dep. at 243:7–244:7.) Gordon told plaintiff he had heard "stories" about plaintiff's behavior from Rossi, Wells, and others. (Braun Dep. at 244:8–15.) The day after plaintiff was fired, March 13, 2012, she filed a charge with the Equal Employment Opportunity Commission ("EEOC"), asserting discrimination based on sex. (Doc. No. 14–1.)

After her firing, plaintiff was unemployed for six months. (Braun Dep. at 254:3–4.) She believes that negative references from UJC cost her positions on two different occasions. (Braun Dep. at 255:2–258:14.) In late August 2012, she was hired to fly for Executive Air Services ("Executive") prior to their completion of her background check. (Braun Dep. at 258:16–260:1.) The company performing the background check for Executive spoke to UJC and was given another poor account of plaintiff's performance there, causing Executive to forego giving plaintiff a raise, "knowingly underpaying [her]" for reasons that were "pretty obvious[ly]" related to UJC's poor report. (Braun Dep. at 260:11–263:2.) Ms. Braun soon left Executive and was hired by Aviation West Charters in December 2012, where she currently works today.

---

[2] Although plaintiff's opposition brief claims she was fired three weeks after she put her complaints in writing, her deposition testimony suggests in one area that it was two weeks, and in another she claimed that it was actually four weeks and change. (*Compare* Braun Dep. at 155:15–157:3 (explaining that she was fired by Gordon two weeks after speaking to Parsons about comments allegedly made by Rossi and Wells to employees of another company) *with* Braun Dep. at 242:23–243:21 (describing how she sent the email to Rossi, then two weeks passed, then two weeks later she was told not go to on the road, then a day or two after that, Gordon called her and informed her that she had been fired)).

(Braun Dep. at 266:9–267:1.) Plaintiff continues to receive phone calls from UJC employees telling her that "people that don't even know [her] . . . are asking questions about [her] because of what [Rossi] and [Wells] are saying about [her]." (Braun Dep. at 272:22–273:2.)

On June 24, 2012, after her firing from UJC but before she found new employment, Ms. Braun filed suit against defendants, asserting causes of action for hostile work environment and wrongful termination/retaliation under Title VII and Ohio law; negligent hiring, retention, and/or supervision; wrongful termination in violation of public policy; negligence; intentional infliction of emotional distress ("IIED"); defamation; tortuous interference with actual and prospective business relations; and assault. (Compl., Doc. No. 1.) On August 22, 2012, defendants filed a motion to dismiss (Doc. No. 12), to which plaintiff filed a response in opposition (Doc. No. 15), and defendants filed a reply (Doc. No. 16). The Court construed the motion to dismiss as a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and, in a memorandum opinion and order issued February 19, 2013, dismissed all but the following claims: (1) hostile work environment under Title VII against defendant UJC only; (2) hostile work environment under Ohio law against all defendants; (3) wrongful termination/retaliation under Ohio law against all defendants; (4) negligence against all defendants; and (5) defamation against all defendants. (Doc. No. 25.)

On April 1, 2013, defendants moved for summary judgment on plaintiff's remaining claims. (Doc. Nos. 30, 31, 35.) Plaintiff filed a response in opposition (Doc. No. 44), and defendants filed a reply (Doc. No. 45). On May 31, 2013, two days after defendants' reply was filed, plaintiff moved to strike it (Doc. No. 47), alleging numerous violations of this Court's Local Rules. Later that same day, without seeking leave of Court, defendants filed an amended

reply brief and supplemental certificates of compliance for several of their previously-filed briefs. (Doc. Nos. 48, 49.) Two weeks later, defendants filed their reply a third time, this time in text-searchable format. (Doc. No. 51.) After submitting the reply a third time, they filed what appears to be two documents in one, the first asking for leave to file *instanter* the text-searchable reply that they already filed earlier that day, and the second appearing to be a response in opposition to plaintiff's motion to strike the first iteration of their reply. (Doc. No. 52.)[3]

## II. PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' REPLY BRIEF

On April 29, 2013, the Court granted the parties' joint motion (Doc. No. 42) for an extension of plaintiff's deadline to file her opposition to summary judgment until May 13, 2013, and plaintiff filed on the deadline. Per Local Rule 7.1(e), defendants had fourteen (14) days from the filing of plaintiff's opposition to file their reply, which gave them until May 27, 2013. Without seeking an extension or otherwise informing the Court, defendants filed their reply on May 29, 2013, two days late. (Doc. No. 45.) The Local Rules of the United States District Court for the Northern District of Ohio provide, "[a]ny motion (other than motions made during hearings or at trial) served and filed beyond the motion deadline established by the Court may be denied solely on the basis of the untimely filing." L.R. 7.1(h).

On May 31, 2013, plaintiff moved to strike the reply, citing its tardiness and alleged failure to adhere to other procedural elements required by the Local Rules and the orders of this Court. First, plaintiff claims the reply brief, clocking in at 17 pages, "exceeds this Court's 15-page limitation without this Court's permission." (Doc. No. 47 at 517.) Plaintiff is mistaken.

---

[3] Later, defendants moved to file supplemental authority with the Court in light of the United States Supreme Court's intervening ruling in *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013). (Doc. No. 55.) That motion was granted.

The Court's Case Management Plan and Trial Order and the Local Rules make clear that the limitation is 20 pages, not 15. (Doc. No. 11 at 77–78); L.R. 7.1(f). Second, plaintiff correctly notes that L.R. 7.1(f) requires "[a]ll memoranda exceeding fifteen (15) pages" to contain "a table of contents, a table of authorities cited, a brief statement of the issue(s) to be decided, and a summary of the argument presented." Defendants did not include any of these with their reply brief. Finally, plaintiff points out that Local Rule 7.1(f) also requires "[e]very memorandum related to a dispositive motion [to] be accompanied by a certification specifying the track, if any, to which the case has been assigned and a statement certifying that the memorandum adheres to the page limitations set forth in this section." Alas, neither defendants' opening brief nor their reply contain the certification.

In response to the motion to strike, defendants offer the peculiar and wholly unsupported interpretation that "the prescribed consequence" for an untimely filing under L.R. 7.1(f) is "that the Judicial Officer may rule at any time after expiration of the time for doing so," ignoring the clear language of L.R. 7.1(h). (Doc. No. 52 at 574.) As for the merits, defendants submit the lackluster excuse that they unknowingly stipulated to a Memorial Day due date, yet their reply was not submitted until two business days after Memorial Day.

On June 14, 2013, along with their opposition to plaintiff's motion to strike, defendants filed a motion seeking leave to file an amended reply *instanter*, allegedly because they discovered that the one they filed previously was not text-searchable. (Doc. No. 52.) But the non-text-searchable reply to which they refer is actually their first amended reply, which defendants filed on May 31, 2013, along with certificates of compliance to every brief going back to April 1, 2013 (Doc. No. 49). The first amended reply was filed two days after their

10

already two-day-late original reply (Doc. No. 48). Defendants filed this entire May 31st care package without ever seeking leave of this Court. If that were not enough, defendants went ahead and filed their second amended reply earlier in the day that they filed the motion seeking leave to file it. (Doc. No. 51.)

Plaintiff, however, has also been complicit in plenty of procedural hijinks thus far. The parties were required by the Court's Case Management Plan and Trial Order to submit joint status reports to the Court every forty-five (45) days beginning forty-five (45) days from the date of the Order, August 15, 2012. (Doc. No. 11 at 74.) As of the telephonic status conference held April 9, 2013, over six months from the due date of the first joint status report, the Court had yet to receive one. At that conference—which, as it were, was conducted sans party representatives, although they had not been excused—the Court admonished the parties for failing to file the joint reports. (Minutes of proceedings, Apr. 9, 2013.) Rather than conferring in an effort to produce a report as soon as possible, the parties amazingly waited fifty-six (56) additional days to file one. (Doc. No. 50.) Counsel from both sides is on notice that future misconduct could lead to sanctions.

In short, neither side has exhibited much understanding of the Local Rules and the orders of this Court. Furthermore, it is the Court's opinion that this litigation would be better served through resolution of the motion on the merits rather than through a motion to strike. Motions to strike are generally disfavored, because they are a "drastic remedy." *See Resolution Trust Corp. v. Vanderweele,* 833 F. Supp. 1383, 1387 (N.D. Ind. 1993) (discussing motion to strike under Fed. R. Civ. P. 12(f)). The Court is mindful that summary judgment is a valuable tool for eliminating unsupported issues prior to trial. "Summary judgment procedure is properly

11

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Defendants' motion, if successful, could greatly reduce the time and expense that might otherwise be required for both sides at trial. In addition, plaintiff has failed to show that she was prejudiced in any way by the procedural defects alleged.

For these reasons, plaintiff's motion to strike defendants' reply brief is **DENIED** and defendants' motion for extension of time to file their reply brief (Doc. No. 52) is **GRANTED**.

### III. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

The party opposing the motion may not rely merely on allegations or denials in its own pleading; rather, by affidavits or materials in the record, they must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of

proof, so long as the movant relies upon the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mere conclusory allegations "are not evidence and are not adequate to oppose a motion for summary judgment." *Miller v. Aladdin Temp–Rite, LLC*, 72 F. App'x 378, 380 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

In ruling on a motion for summary judgment, the court may not take into account credibility or the weight of the evidence, nor may it draw inferences from the facts. *Anderson*,

477 U.S. at 255. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* "If the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Id.* at 248. Accordingly, for the purposes of deciding this motion, and where communicated properly under Rule 56, plaintiff's account of the facts must be accepted as true.

## IV. LAW AND ANALYSIS

In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, [42 U.S.C. § ] 2000(e) *et seq*., . . . is generally applicable to cases involving alleged violations of [Ohio Revised Code] Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Comm'n,* 421 N.E.2d 128, 132 (Ohio 1981). Thus, in the absence of an argument to the contrary, the Court will treat Ohio law as being consistent with federal law. However, one notable area where Ohio law deviates from federal case law is with respect to individual liability. Under Title VII, an employee/supervisor who does not otherwise qualify as an "employer" cannot be held individually liable. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). To the contrary, Ohio Rev. Code § 4112 allows for an individual supervisor or manager to face liability for employment discrimination. *Genaro v. Cent. Transport, Inc.*, 703 N.E.2d 782, 787–88 (Ohio 1999). Non-supervisory employees cannot face individual liability under § 4112. *Minnich v. Cooper Farms, Inc.*, 39 F. App'x 289, 296 (6th Cir. 2002). Thus, an important initial determination in the Court's inquiry is who at UJC constitutes Ms. Braun's "supervisors."

14

## A. Plaintiff's "Supervisors" and Individual Liability

Recently, in *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013), the Supreme Court clarified who constitutes a supervisor under Title VII. The Court held that a supervisor is an employee "empowered . . . to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance*, 133 S. Ct. at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Defendants do not dispute that Eby and Parsons were plaintiff's "supervisors," and Gordon, UJC's President and CEO—as well as the person who actually fired plaintiff—was clearly her "supervisor" as well.

Ms. Braun asserts that Rossi and Wells were also her "supervisors." According to plaintiff, when she flew with Rossi or Wells, they had "the absolute authority on the aircraft[.]" (Braun Dep. at 12:6–13:11.) But there is no evidence that either was empowered by UJC to take tangible employment actions against plaintiff. Plaintiff herself testified that she reported to the chief pilot, Eby, with the director of operations, Parsons, next up the chain of command. (Braun Dep. at 59:24–60:16.) When asked who made "decisions regarding [her] employment, like raises or time off or that sort of thing[,]" plaintiff replied that it was "[a]lways the chief pilot." (Braun Dep. at 18:22–19:5.) Plaintiff speculates that Rossi and Wells attempted to "get [her] fired," but this only reinforces that they were unable to perform "tangible employment actions" on their own. On this record, Rossi and Wells were simply not "supervisors" under *Vance*. Since Title

15

VII law is generally applicable to Ohio law under § 4112, *Vance* also dictates that Rossi and Wells were not "supervisors" under § 4112.[4]

Accordingly, because Rossi and Wells were not "supervisors" under § 4112, they cannot be individually liable, and they are entitled to summary judgment on plaintiff's hostile work environment and retaliation claims against them. Going forward, the Court's evaluation of those particular claims is only with respect to UJC.

**B. Hostile Work Environment**

Plaintiff maintains claims of hostile work environment due to sexual harassment against UJC under both federal and Ohio law. Title VII provides that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a). To make out a hostile work environment claim, plaintiff must demonstrate: (1) she was a member of a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the existence of employer liability. *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006) (citation omitted). There is no dispute that plaintiff belongs to a protected class. Accordingly, the Court will examine the final four of the five criteria.

---

[4] The difference between Title VII and § 4112 that creates individual liability for supervisors/managers in the latter is that § 4112 contains a more expansive definition of "employer" than Title VII. According to the Ohio Supreme Court, the more expansive definition encompasses supervisors/managers, while the Sixth Circuit has determined that Title VII's definition does not. *Genaro*, 703 N.E.2d at 787–88. The definition of a supervisor/manager plays no role in creating this narrow divergence between federal and Ohio law.

*1. Was Plaintiff Subject to Unwelcome Sexual Harassment?*

Plaintiff has certainly set forth allegations involving sexual harassment that she claims was unwelcome. That being the case, not all of her allegations are properly presented as evidence. Some of the allegations in plaintiff's opposition brief misstate or distort plaintiff's testimony and cannot be considered as proper evidence on summary judgment. Namely, certain quotations are attributed to co-workers that are actually Ms. Braun's own subjective characterizations. First, she claims that "Mr. Parsons stated that it was offensive to Mr. Rossi and Mr. Wells that there were female pilots[,]" (Doc. No. 44 at 334), but the cited passage from her deposition actually states:

> And, you know, we're in—we're talking about how they can't—how they can't handle, you know, the uniform and how, you know, how offensive it is to them that there are female pilots.

(Braun Dep. at 68:3–6.) This passage simply describes the subject matter of a conversation between plaintiff and Parsons; it does not attribute any specific statements to anyone. Second, plaintiff claims that Rossi and Wells wanted to make sure she knew "her place[,]" and that she was a "dumb little girl that was challenging their authority." (Doc. No. 44 at 335.) But those quotes are from plaintiff's own construction of their opinion of her, not things they actually said. (*See* Braun Dep. at 87:21–23 ("I think that they thought that I was some dumb little girl that was challenging their authority.").) Third, plaintiff accuses Rossi and Wells of "counseling [her] that she should quit being a pilot and go home to take care of a husband and children." (Doc. No. 44 at 343.) When pressed on the matter, however, plaintiff admitted that they did not actually say any of those things, but rather said simply that she "should settle down and . . . take more interest in [her] personal life[,]" from which she inferred that "they would have been happier if [she]

quit." (Braun Dep. at 84:16–85:18.) Finally, plaintiff alleges that Maguire called her a "bitch," but not until long after she was fired from UJC.

Similarly, plaintiff attributes additional statements to co-workers that are not supported by the record. The first of these is her interjection that Maguire "told [her] that he would rather fly with any male pilot than a female pilot even though he knew [she] was more proficient than most male pilots." (Doc. No. 44 at 333.) The actual deposition testimony to which she cites, however, simply reads that "[UJC's] director of safety had made comments about how he would rather fly with a guy any day of the week even though [plaintiff] was more proficient than most of the male pilots[.]" (Braun Dep. at 251:12–21.) It does not include any factual information regarding to whom he allegedly made the comments, or when, or what he actually said. Plaintiff does not even allege that she knew about the alleged comments while she was employed by UJC. This cannot constitute evidence of sexual harassment. Plaintiff also claims in her brief that Parsons made a statement "indicating that [Rossi] 'has a problem with women." (Doc. No. 44 at 343.) But there is no citation to the record whatsoever to support that statement.

Along the same lines, certain other claims by plaintiff are merely statements alleging a certain reputation or disposition, not allegations of personal sexual harassment. These include plaintiff's statements that "[Rossi] treats women like they're the scum on the bottom of his shoe, and the flight attendants do not like to work with him" (Braun Dep. at 242:18–21); that Gordon, Rossi, and Wells have reputations as "sexist" men (Braun Dep. at 251:8–11; Doc. No. 44 at 340); and that Rossi and Wells had issues with "a woman in the cockpit . . . the fact that [plaintiff] was 31 [years old] . . . [and] the fact that [plaintiff] was single." (Braun Dep. at

248:22–249:2.) Generalities describing an atmosphere of sexism are not direct evidence of discrimination. *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 258 (6th Cir. 2001).

Still more of plaintiff's testimony consists of mere opinions and conclusions, not facts, including those of unidentified captains that plaintiff would be fired if she put her complaints in writing (Braun Dep. at 235:2–5) and that plaintiff was fired because of anti-female animus on behalf of Rossi and Wells (Braun Dep. at 248:17–25). Similarly, plaintiff's unsupported assertion that "[i]t was very obvious that [Rossi and Wells] had an issue flying with a female, because there were other pilots that had issues with them, and they never took it to this extreme" (Braun Dep. at 249:4–7) is a conclusory inference. As defendants note, these are not statements of contested fact, and cannot be considered by the Court.

Finally, plaintiff offers several statements by Parsons that Rossi and Wells were "good ol' boys" (*See, e.g.*, Braun Dep. at 67:9–10), and one apparently joint statement to that effect by Parsons and Eby, along with one supposedly joint description of UJC being "as a rule of thumb . . . a very good ol' boys' network" (Braun Dep. at 63:1–6). These statements are not harassment in themselves, and their import with respect to Rossi, Wells, and UJC is ambiguous at best.

## 2. *Was the Harassment Complained of Based on Sex?*

The "based on sex" requirement of a hostile work environment claim includes sexually related remarks and conduct, as well as non-sexual conduct "where it evinces anti-female animus." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999). On the other hand, workplace harassment, even harassment between men and women, is not automatically discrimination because of sex "merely because the words used have sexual content or

connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Sexual harassment is based on sex where, "but for the fact of her sex, [plaintiff] would not have been the object of harassment." *Williams*, 187 F.3d at 565 (internal quotation omitted).

To be sure, some of the alleged harassing acts would arguably not have occurred but for plaintiff's sex. The remarks by Hoyt to the effect that "he had never flown with a good female or he had never known any good female pilots" are one such example.

Many of the alleged acts of harassment, however, have not been shown to be based upon plaintiff's status as a female. First, plaintiff accuses Rossi and Wells of telling other captains and flight attendants and, eventually, employees of other flight companies, that plaintiff was "unprofessional," "insubordinate," and "wild." (Braun Dep. at 89:16–17; 231:24–232:23.) There is nothing connecting these comments to plaintiff's sex; to the contrary, plaintiff offers testimony of Rossi and Wells also mistreating a male pilot because they felt he was being unsafe. (Braun Dep. at 96:13–19.) Likewise, plaintiff has failed to offer evidence that the alleged negative references UJC gave to other companies had anything to do with her gender. With respect to being "mocked" by Catena and Rossi during the counter-terrorism and counter-skyjacking training, plaintiff herself speculates that it was because she "challenged [Catena's] authority a little too much[,]" and because Catena and Rossi agreed that she had "overstepped her bounds[,]" (Braun Dep. at 164:5–17), not because of her sex. Finally, plaintiff's testimony supports that the alleged tirades by Rossi on the Canada trip resulted from his frustration with how plaintiff handled various pre-flight procedures. Although he allegedly made reference to plaintiff's sex by calling her a "little girl," and arguably by allegedly saying he "knows why

20

[she's] single," the only indication in the record of why he was yelling at her in the first place is that he was dissatisfied with her work performance.

Plaintiff may have been subject to intimidation, ridicule, and mistreatment by Rossi and Wells, but she has not shown that she was treated in a discriminatory manner because of her gender. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000). In the final analysis, only a subset of plaintiff's allegations are properly considered to be "based on sex." It is this subset that the Court must examine, as a whole, to determine whether plaintiff was subjected to a hostile work environment.

*3. Did the Charged Sexual Harassment Create a Hostile Work Environment?*

"Harassment creates a hostile or abusive work environment when it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment . . . .'" *Hickman v. Laskodi*, 45 F. App'x 451, 454 (6th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998); *see also Harris*, 510 U.S. at 21 (describing a workplace "permeated with discriminatory intimidation, ridicule, and insult" as altering the terms and conditions of employment). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted). Conduct that is "merely offensive" is insufficient to support a hostile work environment claim. *Harris*, 510 U.S. at 21. To determine "whether an actionable hostile work environment claim exists, [the courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its

21

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris,* 510 U.S. at 23). The conduct in question "must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)).

Once all of the testimony that is unrelated to allegations of unwanted harassment on the basis of plaintiff's sex has been set aside, little remains. Taking a generous view of what constitutes harassment based on sex, plaintiff's surviving allegations are the following:

- During training, Pete Hoyt, UJC's instructor, made several comments about flying with poor female pilots, and indicated to plaintiff that he either wished to reserve judgment as to her abilities, or indicated that he did not believe plaintiff was a good pilot. Plaintiff does not mention reporting these comments to anyone.

- Because UJC did not have a dress code for female pilots, plaintiff was told to adhere to the flight attendants' dress code. It offended plaintiff to dress like the flight attendants because, according to her, they do not require training to do their jobs, while becoming a pilot requires significant time and training.

- Rossi and Wells complained that plaintiff's heels were a safety hazard, which plaintiff reported to Parsons, who joked that plaintiff's uniform should include a cape, a thong, and six-inch heels. Plaintiff believed the joke was directed at both Rossi and Wells, for overreacting to plaintiff's clothing, but also at her.

- In May and June 2011, plaintiff had conversations with Rossi and Wells in the cockpit where they suggested that she "settle down" and "take more interest in [her] personal life." Plaintiff does not mention reporting these conversations to anyone.

- At unidentified times, Vazzo verbally suggested that he would like to date plaintiff if she would be open to dating him. Plaintiff declined, at which point

Vazzo began to join Rossi and Wells in complaining about plaintiff to other pilots.

- At unidentified times, White sent plaintiff text messages and Facebook messages to the tune of "hey, sexy, what's up," and asking her if she wanted to visit him in Orlando. Plaintiff did not report the messages to anyone, and did not block or defriend White from Facebook.

- Plaintiff heard Wells tell a sexually-themed joke "probably ten" times. Plaintiff did not mention to Wells that it was offensive, or report the joke to anyone. Other than that joke, Wells did not make any other sort of sexual innuendo.

- At some point, Cetena "ma[de] advances and . . . invited [plaintiff] up to his hotel room." No details are provided, and plaintiff does not indicate that she reported it to anyone.

- At another indeterminate time, during a conversation with plaintiff about her training, Cetena remarked that "[m]ost women aren't like you. We can't teach them how to do this stuff. . . . Women just wouldn't get it." Plaintiff does not claim to have reported these comments, either.

The indeterminate nature of some of plaintiff's allegations also weakens them legally, *viz.*: plaintiff asserts in her brief that that, "[o]n around 10 occasions, Mr. Wells told Ms. Braun" a sexually explicit joke. (Doc. No. 44 at 336.) Yet plaintiff was actually responding to the question of how many times she *heard* the joke, not how many times it was told directly to her. (*See* Braun Dep. at 140:14–17.) This is not a superficial distinction: comments overheard by but not directed at a plaintiff are generally considered less severe. *See Black*, 104 F.3d at 826. With respect to the alleged overtures by Vazzo, it is unclear precisely how he suggested that he would like to date plaintiff. "Not all propositions for romance or more are sexual harassment." *E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 999 (9th Cir. 2010).

Even if all of the above-listed allegations of sexual harassment were accepted as evidence, the totality of the circumstances does not reflect a hostile work environment. The alleged conduct consists of infrequent and isolated incidents that were not severe. None involved

any element of physical invasion whatsoever. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (noting that such allegations are "more severe than harassing comments alone"). Moreover, plaintiff does not claim that the behavior unreasonably interfered with her work performance, which further weighs against a finding of a hostile work environment. *See Kean v. IT-Works, Inc.*, 466 F. App'x 468, 470 (6th Cir. 2012).

Accordingly, the Court holds as a matter of law that the evidence, when construed most favorably to plaintiff, is insufficient to support a finding that the sexual harassment alleged was severe or pervasive enough to create an objectively hostile work environment. For this reason, it is unnecessary for the Court to evaluate whether plaintiff subjectively perceived a hostile work environment. UJC is entitled to summary judgment on plaintiff's hostile work environment claims under both Title VII and § 4112.

*5. Could UJC Be Vicariously Liable?*

Even if plaintiff had established a *prima facie* case for a hostile work environment based on sexual harassment, UJC would not be vicariously liable. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. If a harasser is a non-supervisory co-worker, an employer is vicariously liable if it knew or should have known of the harassment and failed to take appropriate remedial action. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 277 (6th Cir. 2009). The plaintiff need not necessarily have reported the harassment to a supervisor; where harassment is pervasive, knowledge may be imputed to the employer. *Jackson*, 191 F.3d at 663.

24

The only alleged harassing acts by a "supervisor" in this case are Eby's suggestion that plaintiff follow the flight attendants' dress code and Parsons's joke about plaintiff wearing a cape, thong, and six-inch heels.[5] These actions fall far short of creating a hostile work environment. As a result, UJC can only be liable if it knew or should have known of the harassment and failed to take appropriate remedial action. But much of the alleged harassing conduct, including the isolated comments by Hoyt, Vazzo, White, and Cetena, was not reported by plaintiff, nor does anything in the record suggest that a supervisor should have otherwise known about it. To be sure, plaintiff has averred that Parsons knew that Rossi and Wells, who he described as "good ol' boys," were not easy to work with. And evidence in the record indicates that, later, Parsons knew that Rossi and Wells did not get along with plaintiff. But there is no evidence that Parsons knew that Rossi and Wells were sexually harassing her, at least not until his conversation with plaintiff in February 2012 and receipt of her subsequent email on February 20. (Doc. No. 44–3 at 414.) Until then, all Parsons knew was that there was personal conflict between them, and "personal conflict does not equate with discriminatory animus." *Barnett v. Dept. of Veterans Affairs*, 153 F.3d 338, 342–43 (6th Cir. 1998), *cert. denied*, 525 U.S. 1106 (1999). Plaintiff does not allege any further acts of harassment after the February 2012 conversation and email, nor does she otherwise allege that Parsons failed to take appropriate remedial action after that time. For these reasons, even if plaintiff had asserted a *prima facie* case for a hostile work environment, UJC would not be liable.

---

[5] Plaintiff does not claim that Vazzo or White were her "supervisors," and she does not accuse Gordon of any harassing conduct. Rossi and Wells were not plaintiff's supervisors. *See* the discussion of who is and is not plaintiff's supervisor, Section IV.A, *supra*.

25

## C. Wrongful Termination/Retaliation

Plaintiff does allege that one unlawful event occurred after February 2012: her firing. Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Thus, "this section prohibits an employer from retaliating against an employee who has 'opposed' any practice by the employer made unlawful under Title VII; and prohibits an employer from retaliating against an employee who has 'participated' in any manner in an investigation under Title VII." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000). Because plaintiff alleges that complaints to supervisors and coworkers led to her termination, rather than her participation in a Title VII proceeding, her claim is interpreted under the "opposition clause." *See id.* at 579 (complaining to anyone—management, unions, other employees, or newspapers—about allegedly unlawful practices is "opposing" conduct).

"[T]he only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of [her] opposition must be reasonable." *Id.* at 580. "In other words, a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful." *Id.* at 579–80.

26

Retaliation claims are examined using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981). *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Under the *McDonnell Douglas/Burdine* framework, a plaintiff has the initial burden to establish a *prima facie* case of retaliation. *Id.* To set forth a *prima facie* case of retaliation under Ohio law, Ms. Braun must establish that: (1) she engaged in a protected activity; (2) her engagement in that protected activity was known to her employer; (3) her employer, thereafter, took an adverse employment action against her; and (4) a causal link exists between her engagement in the protected activity and the adverse employment action. *Id.* at 563. To establish a causal connection, Ms. Braun must offer direct evidence of retaliation or knowledge coupled with closeness in time that creates an inference of causation. *Nguyen,* 229 F.3d at 566 (citing *Parnell v. West,* No. 95-2131, 114 F.3d 1188 (table), 1997 WL 271751, at *2 (6th Cir. May 21, 1997)).

"After proving the existence of a *prima facie* case, the burden [of production] shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Nguyen*, 229 F.3d at 562. "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003). Although the burden of

production shifts throughout the *McDonnell Douglas/Burdine* framework, the burden of persuasion is always upon the plaintiff. *Fuhr*, 710 F.3d at 675.

*1.* Prima Facie *Case*

Defendants' argument in support of summary judgment on plaintiff's retaliation claims consists of repeating the legal standard for a *prima facie* case and citing generally to Gordon's affidavit. (Doc. No. 31 at 225–26.) They make no effort to discuss the individual elements. In their reply, defendants assume, *arguendo*, that plaintiff has made out a *prima facie* case, arguing only that they have articulated a legitimate, nondiscriminatory reason for her discharge and that she has not shown that reason to be pretextual. (Doc. No. 45 at 509–13.)

"Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). For that reason alone, the Court finds that plaintiff has established a *prima facie* case of retaliation for purposes of summary judgment. However, out of an abundance of caution, and to clarify the issues, the Court will examine the elements of plaintiff's *prima facie* case. The third element, whether UJC took an adverse employment action against plaintiff after the alleged protected activity, is clearly met, as plaintiff was fired. The other three elements require further explanation.

*a. Did Plaintiff Engage in Protected Activity?*

Plaintiff testified that, upon hearing that Rossi and Wells were allegedly saying negative things about her to members of other flight companies, she reported to Parsons that she was experiencing "harassment" and "discrimination." (Braun Dep. at 154:4–155:20.) She also

28

sent Rossi an email complaining of "defamation and slander" that was "bordering on harassment," and forwarded the email to Parsons. (Doc. No. 44–3.)

Because plaintiff clearly reported harassment, the only question is whether she had a reasonable, good faith belief that she was being sexually harassed. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012). Having testified to several purported conversations with Parsons and Eby about Rossi's and Wells's attitude toward and treatment of women, beginning from around the time she began work at UJC and continuing until weeks before she was fired, plaintiff has set forth facts from which a reasonable jury could find she reasonably believed that Rossi and Wells were mistreating her because of her sex.

### b. Was Plaintiff's Protected Activity Known to UJC?

In determining whether retaliatory animus is present, "the relevant beliefs or motivations are those of the actual decisionmaker, usually a supervisor or manager." *Roberts v. Principi*, 283 F. App'x 325, 332 (6th Cir. 2008) (citing *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)); *see also McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("[A] statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official.").

Defendants again point to Gordon's affidavit to attempt to establish that UJC did not know of plaintiff's complaints. In the affidavit, Gordon claims that he did not receive any complaints from plaintiff about alleged discrimination and that plaintiff's employment file contains no record of any complaints. (Gordon Aff. ¶ 7.) He also claims that "any complaints made by Ms. Braun would have been made to [Eby and Parsons]," yet avers that no complaints

29

about gender-based harassment were made, despite lacking the personal knowledge to make such a claim. (Gordon Aff. ¶¶ 6, 8–11.)[6]

But UJC does not dispute that Parsons was one of plaintiff's supervisors, and plaintiff testified that she spoke to Parsons regarding discrimination and harassment and forwarded him an email alleging "defamation and slander" that was "bordering on harassment." Parsons's status as plaintiff's supervisor and his title of Director of Operations are evidence that he was a decisionmaker at UJC. Moreover, while it is unclear precisely who made the ultimate decision to fire Ms. Braun, Gordon has not disclaimed that Parsons played a role. Gordon's testimony indicates that the decision to fire her was made at a meeting, which suggests that he was not the only person involved in the decision. (Gordon Aff. ¶ 29.) Because Parsons knew of plaintiff's allegations, and because he was a "decisionmaker" at UJC, and because there are disputed factual issues pertaining to his role in plaintiff's firing, the Court finds that plaintiff has established that her protected activity was known to UJC for purposes of surviving summary judgment.

Plaintiff has also created a disputed issue of fact as to whether Gordon himself knew that plaintiff had reported alleged discriminatory behavior to Parsons. She testified that Gordon told her she was fired for sending "inappropriate emails," and that Rossi and Wells were among the people who had informed him of allegedly improper off-duty conduct. A reasonable jury could infer from this testimony that Gordon had seen plaintiff's February 20, 2012 email to Rossi, which she forwarded to Parsons on the same day.

---

[6] There is no indication that Gordon is speaking as a representative of UJC, and thus the Court interprets the affidavit as having been made in his personal capacity.

*c. Did a Causal Link Exist between Plaintiff's Protected Activity and Her Firing?*

The Sixth Circuit has stated that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support th[e] inference [of causation]" when the proximity of time is rather short. *Nguyen,* 229 F.3d at 567.[7] "'[P]revious cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months.'" *Nguyen*, 229 F.3d at 566–67; *see also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (inferring a causal link based solely on the fact that proceedings to terminate employee were initiated thirteen days after he filed a complaint with the EEOC against his supervisor).

Standing alone, the short time period of approximately four weeks between plaintiff's protected activity and her firing creates an inference of causation for purposes of plaintiff's establishing a *prima facie* case. Even if it did not, however, plaintiff's testimony that Gordon referenced "inappropriate e-mails" when firing her, and the fact that one such purported email, that of February 20, 2012, constitutes protected activity, sufficiently establishes an inference of causation for purposes of making a *prima facie* case for retaliation.

Because plaintiff has made out a *prima facie* case for retaliation, the burden of production shifts to defendants to articulate a legitimate nondiscriminatory ground for plaintiff's dismissal.

---

[7] In *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir. 2008), the Sixth Circuit noted that case law had emerged on both sides of the issue. The court reconciled the two by reasoning that, "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action." *Id.* at 525.

*2. Articulated Nondiscriminatory Reason for Dismissal*

Gordon, UJC's President and CEO, avers that plaintiff was fired "for repeated violations of company standard operating procedures and Federal air regulations, for which Ms. Braun was given numerous prior warnings[.]" (Gordon Aff. ¶ 13.) His general allusions to violations of procedures and regulations are not presented in a properly articulated manner such that plaintiff could present evidence of pretext. However, Gordon articulates two of those alleged violations: breaking the "sterile cockpit rule" by using her cell phone while flying below 10,000 feet and engaging in unsafe flight maneuvers at only 400 feet of altitude. (Gordon Aff. ¶¶ 14– 20.) This constitutes a legitimate, nondiscriminatory reason for plaintiff's discharge, such that the burden of production shifts back to plaintiff to show that the articulated reason is pretextual.

*3. Pretext*

"[T]o survive summary judgment a plaintiff need only produce enough evidence . . . to rebut, but not disprove, the defendant's proffered rationale." *Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 477 (6th Cir. 2012). A plaintiff can rebut an employer's legitimate, nondiscriminatory reason and show pretext by demonstrating that: "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Evidence of an employer's shifting explanations can constitute evidence of pretext. *Cichewicz v. UNOVA Indus. Auto. Sys., Inc.*, 92 F. App'x 215, 220 (6th Cir. 2004).

"'[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason,' the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect." *Jones*, 504 F. App'x at 477 (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). In order for a belief to be considered honestly held, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Plaintiff employs all three methods of showing that UJC's proffered reasons for her dismissal are pretextual. First, to show that Gordon's stated reason for her dismissal has no basis in fact, she simply denies Gordon's allegations that she used her cell phone and performed an unsafe aerial maneuver at low altitudes. (Braun Dep. at 278:1–280:20.) Second, to show that the reason offered was not the actual reason for her termination, she testified that Gordon told her she was fired because she sent "inappropriate e-mails" and for off-duty conduct "not in line with [UJC]'s image." (Braun Dep. at 243:19–244:4.) Third, to show that the reason offered was insufficient to explain her firing, she testified that Wells "was the worst offender" of breaking the "sterile cockpit rule," and that "most every pilot breaks that rule at some point or another." (Braun Dep. at 278:1–11.) For all of these reasons, plaintiff has put forth sufficient evidence of pretext to rebut UJC's offered non-discriminatory reason for her dismissal at the summary judgment phase.

In the face of plaintiff's evidence of pretext, UJC makes no attempt to show that its reason for her dismissal was an honestly held belief. Indeed, the Court has no way to evaluate whether UJC reasonably relied on the facts before it at the time of plaintiff's dismissal, because

33

defendants have not offered any explanation. With respect to plaintiff's alleged violation of the "sterile cockpit rule," defendants offer affidavit testimony of Rossi and Wells. (Doc. No. 35-2, Rossi Aff. ¶ 13; Doc. No. 35-5, Wells Aff. ¶ 11.) Rossi also offers two email messages: the first, sent to Eby on July 2, 2011, does not mention anything related to the "sterile cockpit rule." (Rossi Aff. ¶ 5; Doc. No. 35-3.) The second message, containing all manner of criticism of plaintiff's work, is undated, addressed to "Dear David and Rod," but contains no information to suggest that it was actually sent to Parsons and/or Eby. (Doc. No. 35-4.) Indeed, Rossi describes the two messages differently in his affidavit, describing the first one as having "wr[itten] an email transmission to [Eby]," but describing the second as simply having "wr[itten] the e-mail transmission," without naming any recipients. (Rossi Aff. ¶¶ 5–6.) There is thus no evidence that Eby or Parsons received the second email message. Even if there were, Gordon provides no particularized facts to explain how he came to know that plaintiff allegedly broke the sterile cockpit rule and executed a dangerous maneuver at low altitude. Likewise, there is no evidence presented that Gordon ever flew with plaintiff, nor that anyone reported to him that she had committed the alleged violations. Moreover, neither Rossi nor Wells mentioned the alleged dangerous maneuver, and the record contains no evidence as to the origin of that accusation.

In sum, plaintiff established a *prima facie* case of retaliation by UJC. The burden of production then shifted to UJC, which articulated a legitimate, nondiscriminatory reason for dismissing plaintiff. The burden of production then shifted back to plaintiff, who presented evidence that UJC's proffered nondiscriminatory reason was pretextual. Accordingly, UJC is not entitled to summary judgment on plaintiff's Ohio law retaliation claim.

34

**D. Negligence**

        Plaintiff also alleges that defendants, either directly or indirectly, through their agents and/or employees, negligently caused plaintiff's injuries. The parties agree that, in this context, a claim of negligence against an employer exists "if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment." *Griswold v. Fresenius USA, Inc.*, 978 F. Supp. 718, 734 (N.D. Ohio 1997) (quoting *Kerans v. Porter Paint Co.*, 575 N.E.2d 428, 433 (Ohio 1991)). The parties dispute, however, whether plaintiff has demonstrated that UJC's employees had a past history for sexual harassment and that it was foreseeable that such employees would continue to engage in sexually harassing behavior.

        The Sixth Circuit has observed that, while an "Ohio common law sexual harassment claim requires [a] . . . showing of a 'past history of sexual harassment about which the employer knew or should have known,' . . . Ohio courts have failed to reach a precise definition of 'past history.'" *Gallagher*, 567 F.3d at 277–78 (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 354 (6th Cir. 2005)). The court noted, however, "in the main, the elements of the claim are identical to those of a Title VII hostile work environment claim." *Id.* at 278. Because the Court has already determined that defendants are entitled to summary judgment on plaintiff's hostile work environment claim, *supra*, the Court finds that defendants are also entitled to summary judgment on plaintiff's claim of failing to provide a safe work environment free from sexual harassment under *Kerans*.

**E. Defamation**

"Under Ohio law, the elements of a defamation claim, whether libel or slander, are '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 611 N.E.2d 955, 962 (Ohio Ct. App. 9th Dist. 1992)). "Because the determination of whether words are defamatory is a question of law, summary judgment is appropriate in defamation actions." *Harris*, 513 F.3d at 522 (quoting *Brown v. Lawson*, 863 N.E.2d 215, 219 (Ohio Ct. App. 1st Dist. 2006)).

"Expressions of opinion are protected under the Ohio Constitution and therefore cannot constitute defamation under state law." *Harris*, 513 F.3d at 522 (citing *Vail v. The Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 185 (Ohio 1995)). The Ohio Supreme Court has adopted a totality of the circumstances test to evaluate whether a statement is fact or opinion. *Vail*, 649 N.E.2d at 185. "Specifically, the court should consider: the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared." *Id.* This is a "fluid" standard; the weight given to each factor "will conceivably vary depending on the circumstances presented." *Id.*

The allegedly defamatory statements in this case are comments that plaintiff was "unprofessional," "insubordinate," "wild," "inappropriate on the road," and "drank too much." These statements cannot be verified. Moreover, plaintiff provides little to no context for them. Indeed, the "statements" are presented more as summations of other statements than as actual

quotations. Applying the totality of the circumstances test from *Vail*, it is clear that these are opinions, not statements of fact, and that they cannot support a defamation claim.[8] Accordingly, defendants are entitled to summary judgment on plaintiff's defamation claim.

## V. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED** with respect to all remaining claims against defendants Rossi and Wells. With respect to defendant UJC, defendants' motion for summary judgment is **DENIED** on plaintiff's retaliation claim and **GRANTED** on all other claims.

**IT IS SO ORDERED**.

Dated: July 25, 2013

                                                 **HONORABLE SARA LIOI**
                                                 **UNITED STATES DISTRICT JUDGE**

---

[8] Plaintiff also alleges that "pretty heinous" things were said by someone at UJC during her background check by Executive. (Braun Dep. at 260:11–14.) To the extent this refers to statements of a nature other than that of those already identified, plaintiff has not offered any evidence of who spoke to the persons performing the background check or what was said. This falls far short of being evidence of an actionable statement.