# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CARRIE BRAUN, | ) | CASE NO.  5:12CV1635 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| | ) | |
| ULTIMATE JETCHARTERS, INC., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

After a five-day trial, the jury returned a verdict in favor of plaintiff Carrie Braun ("plaintiff" or "Braun") on her state law retaliation claim, and awarded plaintiff compensatory damages of $70,250.00 and punitive damages of $100,000.00. (Doc. No. 105.) Amidst the flurry of post-trial motion practice, and at the request of plaintiff, the Court entered judgment in favor of plaintiff, in accordance with the jury's verdict. (Doc. No. 109.) Following the entry of judgment, plaintiff moved for attorney's fees (Doc. No. 115), and defendant Ultimate Jetcharters, Inc. ("UJC") filed an appeal from the judgment. (Notice of Appeal, Doc. No. 129.) The Sixth Circuit has held the appeal in abeyance while this Court resolves the parties' post-trial motions. (*See* Doc. No. 132.)

## I.    BACKGROUND

On June 24, 2012, plaintiff brought suit against UJC and several of its employees, claiming that her employment as a pilot with UJC was marred by sexual harassment and gender discrimination. In her complaint, she raised a number of claims

including discrimination and retaliation under federal and Ohio law. (Complaint, Doc. No. 1.) Defendants filed several dispositive motions, and, in two separate memorandum opinions and orders, the Court dismissed the individual defendants and all of plaintiff's claims against UJC except the retaliation claim under Ohio Rev. Code § 4112.[1] (Doc. Nos. 25, 68.)

The case proceeded to trial on the remaining state law retaliation claim. Plaintiff testified that, from the beginning of her employment with UJC, she was exposed to a corporate climate hostile to female pilots. She claimed that two male pilots in particular, Bob Rossi and Burt Wells, continually harassed her about her marital status, her uniform, and her off-duty behavior. (Trial Transcript for Aug. 20, 2013, Doc. No. 120 at 1493-94, 1497, 1550-53, 1607.) According to plaintiff, she was continuously subjected to undeserved criticism on account of her gender, especially from Rossi and Wells, and that crude sexual jokes were callously bantered around in her presence. (*Id*. at 1563-64, 1566, 1640-41.) She testified that she reported this behavior to senior management members on multiple occasions, and was fired a mere three weeks after she sent an email to Dave Parsons, Ultimate Jetcharters's director of operations, requesting that this harassment cease. (*Id*. at 1522, 1533-34, 1631-32, 1660-62, 1664.) During its defense, Ultimate Jetcharters offered the testimony of several of its employees, who testified that plaintiff engaged in wild behavior while off-duty and violated several company policies, including the prohibition against using a cellular phone below a certain altitude. (Doc.

---

[1] Following the ruling on summary judgment, defendants moved for attorney's fees for the dismissed claims. (Doc. No. 83.) The Court held the briefing on this motion in abeyance until after trial. After a post-trial period of briefing, the Court entered an opinion and order denying defendants' motion for fees. (Doc. No. 154.)

No. 120 at 1658; Trial Transcript for Aug. 21, 2013, Doc. No. 121 at 1817, 1822-26, 1829, 1835-36, 1839-42, 1948-54.)

Before the case was submitted to the jury, the parties agreed that if plaintiff obtained a verdict in her favor and was awarded punitive damages, she would be eligible to seek attorney's fees under Ohio law. The parties further agreed to submit the question of punitive damages to the jury but to reserve for the Court the question of attorney's fees in the event that punitive damages were awarded. On August 26, 2013, the jury returned a verdict in favor of plaintiff, and awarded her the aforementioned compensatory and punitive damages. On August 28, 2013, the Court entered judgment consistent with the jury's verdict. (Doc. No. 109.)

The parties then set about the business of filing post-trial motions. On September 4, 2013, UJC filed a motion to stay execution of judgment based upon its anticipated motion for a new trial. (Doc. No. 113.) On September 9, 2013, plaintiff filed her motion for attorney's fees. (Doc. No. 115.) On September 25, 2013, defendants filed a motion for remittitur (Doc. No. 125), and a renewed motion for judgment as a matter of law or for a new trial. (Doc. No. 127.) During this same time period, plaintiff filed her opposition to defendants' motion for attorney's fees (Doc. No. 111), as well as a supplement to her own motion for attorney's fees. (Doc. No. 116.)

On September 27, 2013, UJC filed its notice of appeal. (Doc. No. 129.) On October 3, 2013, the Sixth Circuit filed an appeal remark, wherein it indicated that the appeal "will be held in abeyance until after the district court rules on pending motions, identified under Fed. R. App. P. 4(a)(4), and jurisdiction transfers to the Sixth Circuit Court of Appeals." (Doc. No. 132 at 2635.)

3

II.     **DEFENDANT UJC'S MOTION FOR JMOL OR A NEW TRIAL**

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, UJC moves for judgment as a matter of law. In the alternative, it moves, pursuant to Fed. R. Civ. P. 59(e), for a new trial. (Doc. No. 127 at 2615.)[2] Plaintiff opposes the motion (Doc. No. 148), and UJC has filed a reply. (Doc. No. 150.) According to UJC, the Court must enter judgment as a matter of law in its favor, or grant a new trial, because the evidence offered at trial was legally insufficient to sustain the jury's verdict.

A.  Plaintiff's Motion to Strike

Before the Court can reach the merits of UJC's motion for JMOL and/or a new trial, it must address plaintiff's motion to strike. (Doc. No. 138.) UJC opposes the motion. (Doc. No. 144.) In her motion, plaintiff insists that most of the arguments UJC raised in its Rule 50(b) motion were waived because UJC failed to raise them in its Rule 50(a) motion for a directed verdict. According to plaintiff, UJC must confine its Rule 50(b) motion to the previously raised issue of whether there was sufficient evidence to support a determination that UJC was aware of plaintiff's alleged protected activity.

It is true that a "post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion." *Kusens v. Pascal Co., Inc.*, 448 F.3d 349, 361 (6th Cir. 2006) (citing *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159-60 (6th Cir. 1997)). Nonetheless, the Sixth Circuit has counseled against a hyper-technical application of this rule, especially where the rule's purpose of providing the Court and opposing party notice of any possible deficiencies in the plaintiff's case before

---

[2] In connection with its motion, UJC has also moved the Court to consider additional authority. (Doc. No. 158.) The Court GRANTS this motion.

it goes to the jury has been satisfied. *Id*. (citing, among authority, *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co*., 81 F.3d 606, 610 (5th Cir. 1996)). UJC suggests that, applying a liberal interpretation to its Rule 50(a) arguments, its Rule 50(b) arguments are mere extensions of the arguments advanced at trial.

The Court has revisited the arguments made by UJC at the close of plaintiff's case, and agrees with plaintiff that most of the arguments UJC now advances in support of its "renewed" motion were not raised at trial. (*See* Doc. No. 121 at 1782-1802.)[3] Nonetheless, the issue is academic for two reasons. First, UJC has alternatively moved for a new trial under Rule 59(e). A party may seek Rule 59(e) relief, even if he is not entitled to a post-trial judgment as a matter of law. *See generally* Fed. R. Civ. P. 59(e). While different standards apply to each motion, the Court must still review UJC's arguments testing the sufficiency of the evidence as they pertain to its motion for a new trial. Second, none of the arguments raised by UJC warrant disturbing the jury's verdict under either rule. Plaintiff's motion to strike, therefore, is DENIED.

B.   Legal Standards

Rule 50(a), which governs judgment as a matter of law, provides:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A)   resolve the issue against the party; and

(B)   grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

---

[3] In fact, at trial, counsel for UJC emphasized that the basis for its Rule 50(a) motion was "very specific[,]" noting that "the evidence shows that no complaint about sexual harassment or about discrimination was made by Ms. Braun." (Doc. No. 121 at 1782.)

Fed. R. Civ. P. 50(a). When reviewing a motion for a judgment as a matter of law based on the insufficiency of the evidence, the court should not weigh evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, it must view the evidence in a light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. *Arban v. W. Publ'g Corp*., 345 F.3d 390, 400 (6th Cir. 2003); *Hall v. Consol. Freightways Corp. of Del*., 337 F.3d 669, 672 (6th Cir. 2003). Such a motion should only be granted where "'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (quoting Fed. R. Civ. P. 50(a)).

Rule 59 permits a court to grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). In deciding whether to order a new trial, the governing consideration is "whether, in the judgment of the trial judge, such course is required in order to prevent an injustice . . . ." *Davis ex rel. Davis v. Jellico Cmty. Hosp. Inc*., 912 F.2d 129, 133 (6th Cir 1990) (quoting *Kilgore v. Greyhound Corp*., 30 F.R.D. 385, 387 (E.D. Tenn. 1962)). A motion for a new trial may be granted if "the verdict is clearly against the weight of the evidence." *Denhof*, 494 F.3d at 543 (citing *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991)). Under this standard, a new trial is required "only when a jury has reached a seriously erroneous result as evidenced by [] (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some

fashion, i.e., the proceedings being influenced by prejudice or bias." *Mike's Train House, Inc. v. Lionel*, *L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006) (quote omitted).

      C.     <u>Analysis</u>

As set forth in this Court's previous opinions and orders, plaintiff's complaint alleged that she was subjected to constant and unwelcome sexual harassment and gender discrimination, that she reported this unwelcome gender-based conduct to her superiors, and that UJC failed to take remedial measures to address it; choosing, instead, to discharge her in retaliation for reporting this alleged unlawful discrimination.

To prevail on her retaliation claim under Ohio Rev. Code § 4112.02(I), plaintiff had to establish by a preponderance of the evidence:

> (1)  that she made a complaint, or complaints, to Ultimate Jetcharters of gender discrimination or sexual harassment,
>
> (2)  that she reasonably and in good faith believed constituted unlawful discrimination or harassment,
>
> (3)  that plaintiff was discharged by Ultimate Jetcharters, and there was a causal connection between plaintiff reporting discrimination or harassment and the decision to discharge her.

*See Baker v. Buschman Co*., 127 Ohio App. 3d 561, 567, 713 N.E.2d 487 (Ohio Ct. App. 1998); (Jury Interrogatories, Doc. No. 106); (Trial Transcript for Aug. 23, 2013 [Jury Instructions], Doc. No. 123 at 2563-66.)

UJC contends that there was insufficient evidence to establish that plaintiff put her employer on notice that she believed that she was being sexually harassed and/or discriminated against on the basis of her gender. It maintains that, at best, plaintiff's testimony established that she made generalized complaints about unfair treatment by some of the pilots she flew with, including Rossi and Wells, but that she never advised

her superiors that she believed that she was being sexually harassed or discriminated against on the basis of her gender.

It is true that generalized complaints about mistreatment in the workplace will not suffice to put an employer on notice of perceived unlawful discrimination. *See Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir. 2009); *see, e.g.*, *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591-92 (6th Cir. 2007) (memo complaining that upper management was "out to get" employee was insufficient to put the employer on notice of protected activity). Indeed, "complaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity." *Weaver v. The Ohio State Univ.*, 71 F. Supp. 2d 789, 793-94 (S.D. Ohio 1998).

For example, in *Kiehl v. Univ. Hosp. Health Sys.—Heather Hill, Inc.*, No. 1:08 CV 763, 2009 WL 1586326 (N.D. Ohio June 4, 2009), a case cited by UJC, the employee complained that she was treated unfairly by her female boss. In dismissing the action on summary judgment, the court found that there was nothing in the complaint that suggested that the mistreatment the plaintiff believed she suffered at the hands of her superior was the result of unlawful general animus, or that the calls the plaintiff made to the company's hotline complaining about this unfair treatment put the employer on notice that the employee believed that she was the victim of gender discrimination. *Id*. at *6. In contrast, the evidence was such that a reasonable jury could find that Braun put her superiors on notice that she believed that she had been the victim of sexual harassment and gender discrimination. While plaintiff certainly focused her complaints on the treatment she was receiving from Rossi and Wells, with each complaint she made to

management, plaintiff expressed her belief that the mistreatment was the result of gender discrimination.

At trial, plaintiff testified that the first time she contacted Parsons by phone she complained that Rossi, Wells, and another pilot had mocked her during counter-skyjacking/counterterrorism training. She called their behavior "discriminatory. It's wrong. Women can do this." (Doc. No. 120 at 1508-09.) In her second call to Parsons, plaintiff complained about an incident with Rossi on a flight that ended in a shouting match. She told Parsons that Rossi did not treat her like she was "current" or "qualified" and that it was because Rossi had "a problem flying with women." (*Id*. at 1534.) After yet another run-in with Rossi and Wells, plaintiff called Parsons and advised him that they "have a problem flying with a strong female pilot." (*Id*. at 1632.) After she discovered that Rossi and Wells were allegedly spreading rumors about her to others in the flight industry, she called Parsons for at least a fourth time and exclaimed:

> this has gotten completely out of control. I've told you – I've come to you multiple times telling you about Bob and Bert. You've told me not to worry about it. It's one thing when they're talking to people that know and fly with me. And you know, I can turn to them and everybody knows that it's not a big ordeal. But when they go outside the company to people that we do business with, [they are] ruining my reputation. They're costing me, quite honestly my entire—could be costing me quite honestly my entire career. You told me not to worry about them. This is a problem. This is a huge problem. And I want it stopped.
>
> ***
>
> *This is discrimination. This is harassment. They are only doing this because they do not to like to fly with women.*

(*Id*. at 1660-61, emphasis added.)

9

According to plaintiff, Parsons encouraged her to commit her complaints to writing. Plaintiff testified that, with some reluctance, she composed a watered-down email to Parsons, detailing some of the concerns she had regarding Rossi and Wells. (Doc. No. 120 at 1663.) Even though plaintiff suggested that she exercised restraint in composing the email because she feared retaliation by Rossi and Wells, the subject line of the email still contained the words "cease and desist" and the email used the word "harassment" twice. (Plaintiff's Trial Ex. 1; *see* Doc. No. 44-3.)

Plaintiff's testimony, if believed, established that she perceived the poor treatment she received by Rossi and Wells as being motivated by gender animus, and that she conveyed her belief that she was being discriminated against on the basis of her status as a female pilot to Parsons. The Court is satisfied that a reasonable jury, viewing the evidence as a whole, could have found that plaintiff sufficiently put UJC on notice that she believed that she had been the victim of unlawful gender discrimination and sexual harassment.

Indeed, the evidence offered at trial was sufficient to support each and every element of plaintiff's state retaliation claim. As set forth in plaintiff's brief in opposition, plaintiff's testimony was replete with instances where plaintiff was subjected to sexually offensive language and gender-based harassment and discrimination. This evidence, if believed, would be sufficient to support a determination by the jury that plaintiff reasonably and in good faith believed that she was engaging in protected activity when she complained to Parsons. *See McBroom v. Barnes & Noble Booksellers, Inc.*, 747 F. Supp. 2d 906, 914 (N.D. Ohio 2010) (With retaliation, the question is not whether the conduct being reported constituted actionable discrimination, but rather whether the

10

employee reasonably and in good faith believed that she was reporting such conduct.) (internal cites omitted).

There was also evidence offered at trial to support the jury's determination that there was a causal connection between plaintiff's reporting of the alleged sexual harassment and gender discrimination and the decision by UJC to terminate plaintiff's employment. John Gordon, CEO and founder of UJC, testified that he made the decision to terminate plaintiff—with input from others—and that the decision was based upon repeated reports that plaintiff was violating safety procedures and engaging in unprofessional behavior that reflected poorly upon UJC. (Doc. No. 123 at 2409, 2422.) Parsons echoed Gordon's concerns, testifying that plaintiff was discharged for violating the sterile cockpit rule—relating to the use of cell phones below a certain altitude—and unprofessional off-duty behavior. (Doc. No. 121 at 1872-74.) However, several male UJC pilots testified that they, themselves, had violated the sterile cockpit rule. (Doc. No. 121 at 1900, 1989; Trial Transcript for Aug. 22, 2013, Doc. No. 122 at 2097, 2173; Doc. No. 123 at 2469.) Even Parsons and Gordon admitted that they had, on occasion, failed to honor the rule. (Doc. No. 121 at 1900; Doc. No. 123 at 2433-34.) Yet, plaintiff was the only pilot ever disciplined as a result. (Doc. No. 123 at 2471.) There was also testimony that established that plaintiff's flying maneuvers were not unsafe or illegal. (Doc. No. 122 at 2087; Doc. No. 123 at 2405-08, 2465-66.) As for her alleged unprofessional off-duty behavior, defense witnesses conceded that male UJC pilots used offensive language (Doc. No. 121 at 1912; Doc. No. 122 at 2297-98, and drank alcohol to the point of being "buzz[ed]" or intoxicated while not on duty. (Doc. No. 121 at 1899, 1981-82; Doc. No. 122 at 2092, 2267-68.)

11

Although another fact finder may have viewed the evidence differently, there was sufficient evidence from which the jury could have found that plaintiff was subjected to a double standard because of her gender. This double standard raised a question of fact as to whether the proffered reasons for her discharge were merely a pretext for unlawful discrimination, especially where the decision to terminate came on the heels of plaintiff's email complaining about harassing conduct. *Montell v. Diversified Clinical Servs.*, -- F.3d --, 2014 WL 2898525, at *6 (6th Cir. 2014) (collecting cases and holding that "temporal proximity [between the protected activity and adverse action] alone can be enough" to support an inference of retaliation). Because there was a legally sufficient evidentiary basis for the verdict, and because the Court cannot find that the jury reached a "seriously erroneous result," defendant is not entitled to judgment as a matter of law or a new trial.[4]

## III.    UJC'S MOTION FOR REMITTITUR

As an alternative to a new trial or judgment as a matter of law, UJC urges the Court to order a remittitur of damages. (Motion, Doc. No. 125; Memorandum, Doc.

---

[4] UJC also suggests that the conduct of Rossi and Wells could never support the jury's verdict because it constituted protected speech. The Court will not spend time on this argument, except to make two observations. First, the only question before the jury was whether or not UJC retaliated against plaintiff for reporting alleged sexual harassment and gender discrimination, not whether the comments of Rossi and Wells would have been protected as free speech. Second, the First Amendment cannot be used to excuse or condone sexual harassment or gender discrimination in the workplace, nor can it be used to justify subsequent retaliation. *See Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 884 n.89 (D. Minn. 1993) ("Title VII may legitimately proscribe conduct, including undirected expressions of gender intolerance, which create an offensive working environment. That expression is 'swept up' in this proscription does not violate First Amendment principles.") (cite omitted); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1534 (M.D. Fla. 1991) (imposing Title VII liability on an employer for failing to regulate its employees' harassing speech does not violate the First Amendment); *see also Roberts v. United States Jaycees*, 468 U.S. 609, 628, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984) ("potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection") (cite omitted).

No. 126.) Plaintiff opposes the motion (Doc. No. 147), and UJC has filed a reply. (Doc. No. 151.)

A.     Legal Standard

"[A] jury verdict should not be remitted by a court 'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 443 (6th Cir. 2000) (quoting *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1984)).  The court may reduce the award only if it is "(1) beyond the range supportable by proof, (2) so excessive as to shock the conscience, or (3) the result of a mistake." *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 679 (6th Cir. 2000) (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996)). Remittitur is not appropriate simply because an award is "extremely generous"; rather, it is allowed only when an award is "grossly disproportionate" to the adduced evidence. *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir. 1999). In making its determination, the court must view the evidence in a light most favorable to the prevailing party. *Jackson*, 31 F.3d at 1359 (quote omitted).

B.     Award of Compensatory Damages

UJC does not challenge the Court's instruction as to compensatory

13

damages that set forth the specific types of damages available.[5] Rather, its attack upon the

jury's award of compensatory damages centers on the questions the jury raised during

deliberations.

After an initial period of deliberation, the jury foreperson submitted the

following question:

> We recall the amount of actual damages as $32,750.00. How do we further
> compute any actual damages?—travel, etc?

This question was immediately followed by two additional questions:

> Can [p]laintiff's attorney fees be paid by the [d]efendant? If so, how
> would we compute that?
>
> and
>
> Were any of [the] moving expenses covered by the [b]ankruptcy?

---

[5] Relative to  compensatory damages, the Court's instruction provided:

> You should consider the following types of compensatory damages and no others:
>      One, plaintiff's past lost wages and benefits.
>      Two, the physical and/or emotional pain and suffering that plaintiff has
> experienced and is reasonably certain to experience in the future, including emotional
> pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. No
> evidence of the dollar value of physical or mental/emotional pain and suffering has or
> needs to be introduced. There is no exact standard for setting the damages to be awarded
> on account of pain and suffering. You are to determine an amount that will fairly
> compensate the plaintiff for the injury she has sustained.
>      Three, the reasonable value of medical care that plaintiff reasonably needed and
> actually received as well as any medical care she may reasonably require in the future.
>      Four, any expenses other than lost pay that plaintiff reasonably incurred or will
> incur in the future as a direct result of defendant's retaliation.
>      If you find that defendant has retaliated against plaintiff, you may award as
> actual damages an amount that reasonably compensates plaintiff for any lost wages and
> benefits including bonuses, vacation pay, pension, health insurance, and other benefits
> that plaintiff would have received had she not been retaliated against. Basically you have
> the ability to make plaintiff whole for any wages or other benefits that she has lost as a
> result of her discharge. In determining the amount of any back pay, you must deduct the
> amount of wages and benefits received from replacement income.

(Doc. No. 123 at 2570-71.)

14

(Doc. No. 108 at 1157-58.) The Court discussed the questions with counsel in a conference at side bar. The Court commented that "at this point, it almost seems that they are—they are losing their way to an extent." (Trial Transcript for Aug. 26, 2013, Doc. No. 124 at 2590.) Following the side bar, and by agreement of the parties, the Court provided the following response:

> In response to your questions regarding "actual damages," please be advised that on pages 14-15 of the jury instructions you have been given all of the instructions that you will receive regarding this category of damages. Additionally, you may only make an award in this category of damages to extent that evidence was presented on the issue and you find that plaintiff proved the damages by the preponderance of the evidence.

(Doc. No. 108 at 1156.)

Based on the jury's questions, UJC argues that plaintiff "did not present evidence that her actual damages were $32,500. It appears that the jury included [plaintiff's] rent, utilities, and cell phone bill in the calculation, which [plaintiff] did not incur as a direct result of her termination." (Doc. No. 126 at 2610.)

UJC does not dispute that the jury was properly instructed on the subject of compensatory damages. Furthermore, when the jury inquired as to the scope of such damages, the jury was redirected to the portion of the instructions that listed the only appropriate types of compensatory damages that could be awarded and was further reminded that, of those limited permissible types of damages, they could only award such damages as were proven by a preponderance of the evidence. A jury is presumed to have followed its instructions, and is presumed to have understood a judge's answer to its questions. *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000); *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000)

15

("Federal courts generally presume the jury will follow the instructions correctly as given.") The Court sees no reason to suspect that the jury did not follow these instructions.

Moreover, the award of compensatory damages was not beyond the maximum damages that were reasonably supported by the evidence. At trial, plaintiff offered evidence that her lost wages were approximately $22,500. (Doc. No. 120 at 1692-93.) She also offered testimony that she incurred: (1) additional medical expenses of approximately $250 per month (*Id.* at 1704-08); (2) approximately $8,000 in moving expenses occasioned by having to relocate for a new job (*Id.* at 1696); and (3) increased interest rates on students loans, following her default. (*Id.*) This evidence, alone, was sufficient to support the jury's award of compensatory damages.

In addition, plaintiff offered evidence that she suffered physical and/or emotional pain as a result of defendant's retaliation, which included sleeplessness, worry, and loss of friends and a support system occasioned by the necessity to move to obtain replacement employment. (Doc. No. 120 at 1711-14.) Of course, the calculation of pain and suffering does not "lend itself to the application of a mathematical formula; it requires the application of the jury's best judgment and common sense based on the evidence presented." *Fielden v. CSX Transp., Inc*., No. 2:03-cv-995, 2009 WL 2824459, at *4 (S.D. Ohio Aug. 26, 2009) (citing *Champion v. Outlook Nashville, Inc*., 380 F.3d 893 (6th Cir. 2004)); *see Huber v. JLG Indus., Inc.*, 344 F. Supp. 2d 769, 776 (D. Mass. 2003) ("A district court should not be too quick to conclude that a jury award was excessive because translating legal damage into money damages is a matter peculiarly within a jury's ken, especially in cases involving intangible, non-economic losses.")

(quote omitted).

UJC did not request that the jury break out its compensatory damages award, so there is no way to know precisely how much of the award, if any, represented compensation for pain and suffering. Nonetheless, even if the entire award represented damages for emotional distress, and notwithstanding the fact that plaintiff offered no expert testimony in support, a compensatory damages award of $72,500 would not have been excessive. *See, e.g., Giles v. Gen. Elec. Co*., 245 F.3d 474, 488 (5th Cir. 2001) (approving $150,000 award for emotional distress based solely on lay testimony); *Miller v. Alldata Corp*., 14 F. App'x 457, 466-67 (6th Cir. 2001) (emotional distress award of $300,000 for a plaintiff who provided no medical evidence but claimed to have sleepless nights and stomach problems was not excessive). Thus, considering both the evidence of economic and emotional damages, the Court cannot find that the award of compensatory damages is beyond the range of supportable proof, so excessive it shocks the conscience, or the result of mistake. UJC has not demonstrated its entitlement to a remittitur of the compensatory damages award.

C.     <u>Award of Punitive Damages</u>

"It is well-settled that [Ohio Rev. Code §] 4112.99 permits an award of punitive damages in a discrimination claim." *Waddell v. Roxane Lab., Inc*., No. 03AP-558, 2004 WL 1103710, at *13 (Ohio Ct. App. May 6, 2004) (citing *Rice v. CertainTeed Corp*., 84 Ohio St. 3d 417, 704 N.E.2d 1217 (1999)). Under Ohio law, actual malice is necessary for an award of punitive damages. *Preston v. Murty*, 32 Ohio St. 3d 334, 335, 512 N.E.2d 1174 (1987). Actual malice is defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a

17

conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id*. at 336. "Finally, unlike compensatory damages, the jury is given wide discretion in determining whether punitive damages are justified and in assessing the amount of such damages based upon its collective judgment as to the punitive and deterrent effect that such an award would have." *Waddell*, 2004 WL 1103710, at *13 (internal quote omitted).

Plaintiff insists that there is substantial evidence in the record that would support the jury's award of punitive damages. However, UJC is correct in observing that much of the evidence plaintiff points to relates to her dismissed sexual harassment claim. In Ohio, there can be no award of punitive damages in the absence of an underlying cause of action. *See Bishop v. Grdina*, 20 Ohio St. 3d 26, 28, 485 N.E.2d 704 (1985), *superseded by rule on other grounds as stated in Niskanen v. Giant Eagle, Inc*., 122 Ohio St. 3d 486, 912 N.E.2d 595 (2009); *Spalding v. Coulson*, 104 Ohio App. 3d 62, 77, 661 N.E.2d 197 (Ohio Ct. App. 1995). "Rather, punitive damages are awarded as a mere incident of the cause of action in which they are sought." *Spalding*, 104 Ohio App. 3d at 77-78 (quoting *Bishop*, 20 Ohio St. 3d at 28). Because the Court dismissed plaintiff's sexual harassment claim, and the jury, thus, did not award compensatory damages for sexual harassment, an award of punitive damages could not rest upon any evidence that plaintiff was sexually harassed.[6]

---

[6] In fact, the jury was specifically instructed that it was not permitted to award damages for alleged gender discrimination or sexual harassment. (Doc. No. 123 at 2566.)

However, evidence of retaliation can support a punitive damages award. *See EEOC v. Harbert-Yeargin, Inc*., 266 F.3d 498, 514 (6th Cir. 2001) (punitive damages award supported by evidence that employer retaliated against an employee for reporting an incident of sexual harassment). The evidence offered at trial, viewed in a light most favorable to plaintiff, supported a finding that UJC relied upon acceptable or routinely tolerated behavior to support its decision to terminate plaintiff's employment, and that this decision came within weeks of plaintiff's written report of alleged sexual harassment. *See, e.g., Jeffries v. Wal-Mart Stores, Inc*., 15 F. App'x 252, 264 (6th Cir. 2001) (approving an award of punitive damages for retaliation where the evidence demonstrated that the employer used an "undeserved written reprimand for arguably appropriate behavior" to justify dismissal). This behavior, if believed, would support either a finding of a spirit of revenge, or a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

With respect to the latter, UJC argues that the evidence failed to establish that John Gordon, the CEO of UJC and the ultimate decision-maker, knew that plaintiff had engaged in protected activity when he terminated her employment. There are two problems with this position. First, Parsons testified that he participated in the decision to discharge plaintiff, and he had received numerous complaints from plaintiff. (Doc. No. 121 at 1873.) Second, Gordon admitted at trial that he was aware that plaintiff had reported what she believed to be harassment when he ended her employment, even though he disagreed with her assessment that she had been the victim of sexual harassment. (Doc. No. 123 at 2429.)  Because there is credible evidence to support the award of punitive damages, the Court will not order a remittitur. *See Am. Trim, L.L.C. v.*

*Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) ("If there is any credible evidence to support a verdict, it should not be set aside.") (cite omitted).

IV.     **PLAINTIFF'S MOTION FOR ATTORNEY'S FEES**

Plaintiff's motion for attorney's fees (Doc. No. 115) rests upon the jury's finding of malice and its award of punitive damages. In addition to filing an opposition to this motion (Doc. No. 135),[7] UJC filed a memorandum regarding jurisdiction, in which it suggested that this Court lacks jurisdiction to entertain plaintiff's motion for attorney's fees.[8] (Doc. No. 134.) In its memorandum, UJC directs the Court's attention to the unreported decision of *Clarke v. Mindis Metals, Inc.*, No. 99-5517, 99 F.3d 1138 (6th Cir. Oct. 24, 1996) (unreported table decision).

The litigation in *Clarke* involved the alleged breach of a lease agreement. The agreement contained a provision that provided attorney's fees to the prevailing party upon any action on the lease. The case went to trial with the parties specifically reserving the issue of the availability of attorney's fees for the court to determine subsequent to entry of the jury's verdict. At trial, the jury found that the lessee did not breach the lease,

---

[7] Plaintiff has moved to strike UJC's opposition to her motion for fees (Doc. No. 139), UJC filed a brief in opposition (Doc. No. 145), and plaintiff filed a reply. (Doc. No. 146.) Citing Local Rule 7.1(d)—requiring responses to non-dispositive motions to be filed within 14 days—plaintiff insists that UJC's response was tardy by two weeks. UJC suggests that its opposition brief was timely filed under the 30-day period allowed for responses to dispositive motions under Rule 7.1(d). According to UJC, the fee petition is a dispositive motion because its resolution will result in a final judgment. *See generally Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993) (resolution of post-judgment attorney's fees is dispositive of a party's claim); *Bennett v. Gen. Caster Serv. of N. Gordon Co., Inc.*, 976 F.2d 995, 998 (6th Cir. 1992) (resolution of post-trial motion for sanctions was dispositive because, after its resolution, nothing would remain but to execute judgment). Given the unusual posture of the case, the Court is inclined to give UJC the benefit of the doubt. As set forth below, all that remains for the Court to do to effectuate a final judgment is to resolve plaintiff's motion for fees. Thus, plaintiff's motion can—in a sense—be considered dispositive. Plaintiff's motion to strike is DENIED.
[8] Interestingly, UJC does not argue that this Court lacks jurisdiction to entertain any of *its* post-trial motions.

and the trial court formally entered what it deemed a "final judgment" in favor of the lessee. Following the entry of judgment, the lessee moved for attorney's fees, which the trial court granted in a subsequent order.

On appeal, the lessor argued that the trial court lacked jurisdiction to entertain the motion for fees having already entered final judgment. *Id*. at *3. The Sixth Circuit rejected the argument. Citing Fed. R. Civ. P. 54(d)(2)(B), the court began with the observation that, typically, the determination of attorney's fees is a collateral matter to be determined after the trial court enters final judgment.[9] It concluded, however, that Rule 54 did not apply to the lessee's request for fees because it was not collateral to the judgment, but represented an element or component of damages, as set forth in the lease. *Id*. at *8-*10.

The court focused upon the parties' agreement that the trial court would resolve the issue of damages. Because the trial court had not addressed this issue, its judgment entry was not final. *Id*. at *6 ("Whether a decision is final depends on whether the district court is through with the case") (quote omitted). The Court concluded:

> we hold that the district court had jurisdiction to entertain an award of attorney's fees to [lessee] in this case for four reasons. First, its entry of final judgment did not comport with Rules 58 and 54(b) because it did not dispose of the issue of attorney's fees that was a part of the claims and counterclaims advanced in this case. Second, . . . Rule 58's provision that a motion for attorney's fees cannot delay the entry of final judgment is inapplicable to this case. Third, even if the district court's entry of judgment . . . had been final, we would construe [lessee's] motion for attorney's fees as a Rule 60(b)(1) motion for relief from the judgment on account of mistake. Finally, we note that it would be hypertechnical and

---

[9] Rule 54(d)(2)(A) provides that, "A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Rule 54(d)(2)(B)(i) provides that any such motion must be filed "no later than 14 days after the entry of judgment[.]"

not in accord with the spirit of the Federal Rules to interpret them in a fashion that would lead to the conclusion that the district court lacked jurisdiction to entertain the motion for fees. We would be remiss in not emphasizing, however, that the district court erred by entering "final judgment" before deciding the issue of attorney's fees. To avoid confusion, final judgment orders should not be entered until non-collateral attorney's fees issues (and all other claims in the case against all parties) are fully resolved.

*Id.* at *7.

Similarly here, the parties stipulated to having the Court resolve the issue of attorney's fees in the event that the jury awarded punitive damages. *See, e.g., Scotts Co. v. Cent. Garden & Pet Co.*, 256 F. Supp. 2d 734, 748 (S.D. Ohio 2003) (appropriate for court to determine fees where the parties have stipulated to such a determination); *Kissinger, Inc. v. Singh*, 304 F. Supp. 2d 944, 951-52 n.3 (W.D. Mich. 2003) (same). As a result, there exists at least a colorable argument that when plaintiff asked that the jury's verdict be recorded, what it received was a non-final order. While the Court entered judgment consistent with the jury's verdict, its work was not finished because it had not yet resolved the issue of attorney's fees. Thus, when plaintiff filed a motion for attorney's fees, it did not do so under Rule 54 or 58 of the Federal Rules of Civil Procedure. The gesture amounted to nothing more than a request that the Court finish its work. Though plaintiff was not required to file a motion for fees, any such motion could be construed as a motion under Rule 60(b) for relief from judgment.

As was the case in *Clarke*, plaintiff's entitlement to fees would go to the merits of any award because it would be a component of damages. While Ohio Rev. Code § 4112.99 does not specifically provide for attorney's fees, "'Ohio has long permitted recovery of attorney fees, even in the absence of statutory authorization, where

punitive damages are proper.'" *Johnson v. Con-Way Freight, Inc*., No. 4:10CV2167, 2010 WL 4735754, at *1 n.3 (N.D. Ohio Nov. 15, 2010) (quoting *Sutherland v. Nationwide Gen. Ins. Co*., 102 Ohio App. 3d 297, 657 N.E.2d 281, 283 (Ohio Ct. App. 1995)). Under Ohio law, "[i]f punitive damages are proper, reasonable attorney fees may be awarded as an element of compensatory damages." *Miller v. Grimsley*, 197 Ohio App. 3d 167, 173, 966 N.E.2d 932 (Ohio Ct. App. 2011). Attorney's fees cannot, therefore, be considered collateral to the judgment.

UJC suggests that the facts diverge from *Clarke*, however, on one significant point. In *Clarke*, the lessor had not yet filed his notice of appeal when the trial court issued its ruling on the motion for fees. The Sixth Circuit panel found that the trial court's subsequent ruling on attorney's fees essentially completed its work and contributed to a final judgment in the case. Here, UJC has taken an appeal from the Court's August 28, 2013 judgment entry. This fact, alone, does not preclude the Court from ruling on the present motion. If the Court's judgment is not final until it rules on the issue of plaintiff's fees, then the notice of appeal was premature. Sixth Circuit law provides that an improvidently filed notice of appeal may be disregarded by the district court. *See Cochran v. Birkel*, 651 F.2d 1219, 1222 (6th Cir. 1981) ("We are persuaded that filing a notice of appeal from a nonappealable order should not divest the district court of jurisdiction and that the reasoning of the cases that so hold is sound.") (internal quote omitted). Even if the judgment entry was final, jurisdiction still has not transferred to the Sixth Circuit because Fed. R. App. P. 4(B) provides that the filing of post-trial motions under Fed. R. Civ. P. 50(b), 52(b), 54, 59, or 60 delays the effect of any notice of

appeal, a fact that the Sixth Circuit recognized when it stayed the appeal. Either way, this Court has jurisdiction to consider plaintiff's motion.

Turning to the merits, plaintiff submitted two sets of billing statements. The first set, documenting attorney time spent prior to the filing of the post-trial fee petition, shows fees totaling $212,112.50. (Plaintiff's Counsel's Billing Statements, Doc. No. 116.) The second set, documenting attorney time spent on post-trial matters, shows an additional $64,625 in fees. (Plaintiff's Counsel's Supplement, Doc. No. 152.) UJC opposes plaintiff's request for fees as unreasonable, and, indeed, the Court finds that its task in ruling on this motion centers on the determination of the reasonableness of the fee request.

In the initial round of briefing on plaintiff's motion for fees, neither side addressed the issue of reasonableness. The Court permitted the parties to supplement the filings to address this critical issue. In its initial supplement, UJC offered argument on the reasonableness of Braun's fee petition, and supported its opposition with copies of its counsel's verified billing statements. (Doc. No. 153; Affidavit Sidney Freeman and attached billing statements, Doc. No. 153-1.) Plaintiff's supplement included affidavits from her attorneys in this case, as well as an affidavit from attorney David Eberly, who offered an opinion as to the reasonableness of the requested fees. (Doc. No. 155; Affidavit of David Eberly, Doc. No. 155-4.) UJC was subsequently permitted to file a sur-reply, in which it offered its own expert opinion as to the reasonableness of plaintiff's

fee petition.[10] (Doc. No. 161; Affidavit of Thomas Haskins Jr., Doc. No. 161-1.)

The method for evaluating fee petitions for claims under Ohio law was set forth in *Bittner v. Tri-County Toyota, Inc*., 58 Ohio St. 3d 143, 569 N.E.2d 464 (1991). Relying on federal law, the Ohio Supreme Court observed that "'[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Bittner*, 58 Ohio St. 3d at 145 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)). This product has come to be known as the "lodestar." *Garner v. Cuyahoga County Juvenile Court*, 554 F.3d 624, 642 (6th Cir. 2009). After calculating the lodestar, the court may modify the amount by applying the factors listed in Ohio Rule of Professional Conduct 1.5(a). *See Miller*, 197 Ohio App. 3d at 173. These factors are:

> the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent.

*Bittner*, 58 Ohio St. 3d at 145-46 (citing the predecessor to Ohio R. Prof. Cond. 1.5(a)); *Miller*, 197 Ohio App. 3d at 173.

---

[10] Because the parties were permitted to supplement their briefing on the motion with affidavits and other evidence, the Court finds that it does not need to hold an evidentiary hearing on this motion. *See State ex. rel. Chapnick v. E. Cleveland City Sch. Dist. Bd. of Educ*., 93 Ohio St. 3d 449, 451, 755 N.E.2d 883 (2001) (a trial court is not required to hold an evidentiary hearing on an application for attorney's fees).

A.    Unsuccessful Claims

Much of UJC's opposition to plaintiff's fee petition is devoted to the notion that the award is not proportional. Because plaintiff only prevailed on one of the eleven claims raised in the complaint, UJC suggests that an award of all fees incurred litigating this matter would be disproportionate to the success achieved at trial. Accordingly, UJC posits that Braun should only be permitted to recover the fees expended litigating her one successful claim—the state law retaliation claim.

"Proportionality is not synonymous with reasonableness." *Miller*, 197 Ohio App. 3d at 174. "A 'reasonable' fee must be related to the work reasonably expended on the case and not merely to the amount of the judgment awarded." *Id.* (quote omitted). A court should resist the urge to reduce the calculation of a fee judgment to a simple mathematical formula of the ratio of successful to unsuccessful claims. *Hollingsworth v. Time Warner Cable*, 168 Ohio App. 3d 658, 684, 861 N.E.2d 580 (2006) (quote omitted).

That said, "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Hensley*, 461 U.S. at 435 (internal quote omitted). As a general rule, a trial court must separate unsuccessful claims and claims for which attorney's fees may not be awarded, from those for which fees may properly be awarded. *Hensley*, 461 U.S. at 434-45; *Bittner*, 58 Ohio St. 3d at 145. Such a division, however, is not always possible. As the Court in *Hensley* observed:

> In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court

26

should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley*, 461 U.S. at 435.

In the present case, the foundation for all of the claims asserted in the complaint was the treatment plaintiff alleged she received while employed as a pilot for UJC. The same factual allegations supporting the dismissed claims formed the core of plaintiff's successful state law retaliation claim, and these same facts were sufficient to warrant a jury award of compensatory and punitive damages at trial. Much of counsel's time would have been generally devoted to discovering and arguing the legal significance of these shared facts, and their time cannot be neatly compartmentalized into discrete efforts to advance any one particular claim. Given the fact that the claims are so thoroughly intertwined, the Court cannot—and will not—reduce the award to account for unsuccessful claims. *See Edlong Corp. v. Nadathur*, No. C-120369, 2013 WL 1294597, at *3 (Ohio Ct. App. Mar. 22, 2013) (noting that "where multiple claims are rooted in the same allegations, facts, discovery, and legal arguments, a trial court does not abuse its discretion in awarding attorney fees for the time spent on the claims") (cites omitted); *see, e.g.*, *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 823 (6th Cir. 2013) (refusing to reduce award for sexual harassment, despite dismissal of retaliation and other claims, where all of the claims arose out of plaintiff's treatment in the workplace); *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 421 F.3d 417, 423 (6th Cir. 2005) (refusing to reduce a fee to plaintiff for unsuccessful claims where the successful and unsuccessful claims shared a "common core of facts" or were "based on

related legal theories") (quote omitted); *Barnes v. City of Cincinnati*, 401 F.3d 729, 745-46 (6th Cir. 2005) (similar).

    B.   <u>Reasonableness of Fee Request</u>

       The Court now turns to the reasonableness of the fees sought. The party seeking fees bears the burden of proving that they are reasonable. *Reed v. Rhodes*, 179 F.3d 453, 472 (6th Cir. 1999); *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999). According to plaintiff's submissions, plaintiff's three attorneys spent approximately 1,024.75 hours litigating this case, at an hourly of between $250 and $275, for a total of $276,737.50 in fees. (*See* Doc. No. 116 at 1218; Doc. No. 152 at 2775.) UJC suggests that these figures are grossly inflated, and represent considerable excess for which it should not be responsible.

       "Calculation of the lodestar necessarily requires the trial court to exclude any hours that were unreasonably expended, e.g., hours that were redundant, unnecessary or excessive in relationship to the work done." *Miller*, 197 Ohio App. 3d at 173; *see Hensley*, 461 U.S. at 434; *Reed v. Cracker Barrel Old Country Store, Inc*., 171 F. Supp. 2d 751, 758 (M.D. Tenn. 2001) ("Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary[.]") (internal quote omitted). "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Reed*, 171 F. Supp. 2d at 758 (internal quote omitted, emphasis in original).

       Plaintiff must come forward with documentation that substantiates the reasonableness of the hourly rate charged and the hours incurred. *See McCarthy v.*

*Ameritech Publ'g, Inc*., 289 F.R.D. 258, 263 (N.D. Ohio 2013); *Se. Land Dev., Ltd. v. Primrose Mgmt. L.L.C.,* 193 Ohio App. 3d 465, 476, 952 N.E.2d 563 (Ohio Ct. App. 2011) (cite omitted). The documentation submitted must be sufficiently detailed to enable the court to determine whether the time *actually* expended was *reasonably* expended. *See McCarthy*, 289 F.R.D. at 263 ("Where the documentation is inadequate, the court may reduce the award accordingly.") (cites omitted).

a.        *Reasonable Hourly Rate*

"A district court has broad discretion to determine what constitutes a reasonable hourly rate for an attorney." *Wayne v. Vill. of Sebring*, 36 F.3d 517, 533 (6th Cir. 1994) (cite omitted). A reasonable hourly rate will be sufficient to attract competent counsel, and yet will avoid producing a windfall for lawyers. *Reed*, 179 F.3d at 471. "A useful guideline in determining a reasonable hourly rate is the 'prevailing market rate[] in the relevant community.'" *Dowling v. Litton Loan Serv. LP*, 320 F. App'x 442, 447 (6th Cir. 2009) (quoting *Blum v. Stenson*, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)). The prevailing market rate is defined as "that rate which lawyers of comparable skill and experience can reasonably expect to command . . . ." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2007); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).

Plaintiff's documentation demonstrates that three attorneys from the same firm provided legal services on her behalf. Attorney Avonte Campinha-Bacote is the managing and founding partner of Campinha Bacote LLP ("CB Law"). (Declaration of Avonte D. Campinha-Bacote, Doc. No. 155-1 at ¶ 2.) He served as lead counsel and billed the most time on this case. (*Id.*) He has been admitted to practice law in Ohio since

29

2010, and he currently bills his time at an hourly rate of $275[11]. (*Id*. at ¶¶ 1, 8.) Attorney Joseph Russell served as co-counsel in this case. He is a partner in the firm of CB Law and has been admitted to practice law in Ohio since 2008.[12] (Declaration of Joseph B. Russell, Doc. No. 155-2 at ¶¶ 1-2.) His hourly rate is also $275. (*Id*. at ¶ 6.) The third attorney, Daniel Dersham, is an associate with CB Law. He was admitted to the practice law in California in 2012. He did not enter an appearance in this case, did not participate in the trial, and appears to have devoted much of his time to motion practice. His time was billed at the hourly rate of $250. (Declaration of Daniel E. Dersham, Doc. No. 155-3 at ¶¶ 1, 2, 5; Doc. No. 116.)

To support the reasonableness of the hourly rates charged by these attorneys, plaintiff offers the opinions of attorneys Campinha-Bacote and Russell that these rates are "fair" for the relevant legal community. (Doc. No. 155-1 at ¶ 9; Doc. No. 155-2 at ¶ 6.) Plaintiff also offers the expert opinion of attorney David Eberly, who was admitted to practice law in Ohio in 1996 and whose practice includes employment litigation. (Affidavit of David A. Eberly, Doc. No. 155-4 at ¶¶ 2, 3, 5.) He supports his opinion that the hourly rates charged by plaintiff's counsel in this case are "reasonable and consistent with industry practice" by reference to the *Economics of Law Practice in Ohio in 2013, A Desktop Reference*, which he has appended to his affidavit. (*Id*. at ¶¶ 11-12; *see* Doc. No. 155-5.)

UJC challenges the reasonableness of these fees, noting that its attorneys billed out their services in this case at much lower hourly rates, ranging from $110 to

---

[11] Attorney Camphina-Bacote was admitted to the Ohio Bar on May 10, 2012.
[12] Attorney Russell was admitted to the Ohio Bar on November 17, 2008.

$210. (*See* Doc. No. 153 at 2781; Doc. No. 153-1, Exs. A, B.) It also offers the opinion of attorney Haskins, who has litigated in Ohio for more than 30 years and who opines, without elaboration, that the rates charged by plaintiff's attorneys are not reasonable. (Doc. No. 161-1 at ¶¶ 2, 12.)

In support of his opinion that the $250 hourly rate charged by plaintiff's trial counsel was reasonable, attorney Eberly notes that, according to the *Desktop Reference*, the median range for hourly rates for local attorneys practicing in the general area of "labor law" is $250 to $288. (Doc. No. 155-4 at ¶ 12 [citing Doc. No. 155-5].) This range is derived from a chart whose only consideration is the area of law in which the attorney practices, and, specifically, does not take into account the experience level of the attorneys in the various practice areas.[13] (*See* Doc. No. 155-5 at 2894.) Another chart contained within the *Desktop Reference* provides that the median hourly rate for attorneys with the level of experience of plaintiff's trial counsel (3 to 5 years) is between $175 and $200.[14] (*Id.* at 2893.) This chart also has its limitations as it does not take into consideration the fact that attorneys practicing in the area of employment law may generally be able to command a higher hourly rate than those practicing in other areas of law.

---

[13] Attorney Eberly also avers that the $250-$288 range is consistent with his hourly billing rate. (Doc. No. 155-4 at ¶ 12.)  However, attorney Eberly has been practicing law in the State of Ohio for "over 17 years[,]} considerably more time that both of plaintiff's trial attorneys combined. (*Id.* at ¶ 11.)

[14] Especially with respect to attorney Camphina-Bacote, the Court notes that it is generous to consider salaries within the 3-5 years' experience range, inasmuch as Camphina-Bacote had only been practicing law for two years when he filed the present suit on behalf of plaintiff.

As was evident at times by the lawyering of plaintiff's counsel in this case, plaintiff's litigation team had very little trial experience. While counsel achieved an excellent result for their client, defendants should not have to pay a premium for plaintiff's counsel's learning curve. The Court believes, therefore, that an hourly rate of $200 adequately reflects the challenges associated with the practice of labor law, while also recognizing that trial counsel are far from seasoned veterans.

Applying the same analysis, the Court finds that the rate charged by junior associate Dersham ($250 per hour) is excessive. The survey relied on by plaintiff provides that the overall median rate for an attorney with one to two years of experience is $150 per hour. (Doc. No. 155-5 at 2893.) The Court will, therefore, reduce Dersham's hourly rate to $150 to more accurately account for the work he performed and his almost negligible level of experience.

### b.    *Reasonable Number of Hours*

UJC also challenges the number of hours expended by plaintiff's counsel in this litigation, primarily by comparing those hours to the number of hours claimed by its own counsel during the same relevant time period. Specifically, UJC notes that while its attorney billing records show that defense counsel claimed a total of 516.45 hours of attorney time for the entire case, plaintiff's counsel's records show that her counsel expended 1,024.75 hours, almost twice the hours charged by defense counsel.[15] (Doc. No. 153 at 2781-82 [citing Exs. A, B].) According to UJC, the disparity constitutes compelling evidence of the existence of excessive and wasteful billing.

---

[15] Of course, the Court's inquiry is limited to the reasonableness of the hours claimed by plaintiff's counsel.

Having reviewed plaintiff's counsel's billing statements, the Court does find evidence of excessive billing. For example, billing sheets reflect that plaintiff's attorneys spent approximately 153.25 hours responding to defendants' summary judgment motion. While most of the work was performed by attorney Dersham, the attorney billing out at the most modest hourly rate, all three attorneys devoted considerable time to this filing. The Court finds this to be excessive. There was nothing novel or unique about the issues raised by defendants' summary judgment motion, and, while numerous depositions were taken during discovery and excerpts were featured in the opposition brief, the record was not so voluminous as to warrant the time alleged to have been expended preparing it. *See Hisel v. City of Clarksville*, No. 3:04-0924, 2007 WL 2822031, at *5 (M.D. Tenn. Sept. 26, 2007) (reducing attorney's fee award for excessive billing for simplistic tasks where the issues in the case were "hardly new or novel" to counsel).

Similarly, counsel's billing sheets reflect that 52.25 attorney hours were devoted to responding to defendants' motion to dismiss. Like the summary judgment motion, the motion to dismiss did not blaze any new ground or necessitate an extraordinary amount of time to research or draft. Counsel's post-trial motion practice also appears to have suffered from the same excessive staffing. Time sheets reflect that plaintiff's counsel spent approximately 117.25 hours researching and drafting a response to UJC's motion for judgment as a matter of law. (Doc. No. 152.) This motion rehashed arguments raised at summary judgment and did not demand the effort expended by plaintiff's counsel.

Plaintiff's counsel also took a great many detours during the pendency of

33

the case. The vast majority of substantive motions filed in this case were immediately met with a motion to strike. (*See, e.g.*, Doc. Nos. 47, 79, 138, 139.) These procedural motions were often of dubious merit and were seldom granted. The motions also had the effect of diverting the Court's attention away from the merits. While both sides engaged in this folly, the Court will not reward plaintiff's counsel for their role in it.

Turning to the time spent in preparation for and in trial on this matter, the billing statements reflect that attorney Russell devoted approximately 18.5 hours to preparing his opening statement.[16] The Court finds this to be excessive. Both of plaintiff's trial attorneys have also billed an extraordinary number of hours each day of the trial. For example, while the Court's records reveal that the first day of trial—which was limited to selecting a jury and addressing *in limine* motions—lasted four and one-half hours, attorney Campinha-Bacote claimed 22.75 hours in trial and trial preparation, and attorney Russell claimed 19.25 hours. (Doc. No. 116 at 1216.) Indeed, attorney Campinha-Bacote claimed more than 20 hours on four of the five days of trial, and the two trial attorneys each claimed an average of 18.7 hours per day of trial.[17] (*Id*. at 1216-17.) The Court recognizes that a trial attorney's day does not end when court is adjourned, and that preparations must be made for the next day. Nonetheless, the hours claimed are well above what an attorney would bill his own client, and cannot, therefore,

---

[16]Because counsel often engaged in "block" billing, where a laundry list of the day's legal activities were lumped together, this figure represents an estimate.

[17] Specifically, attorney Campinha-Bacote claimed the following hours: 22.75 hours on August 19, 2013, 20.5 hours on August 20, 2013, 23 hours on August 21, 2013, 20.25 hours on August 22, 2013, and 15.75 hours on August 23, 2013. (Doc. No. 116 at 1216-17.) For that same period, attorney Russell claimed: 19.25 hours for August 19, 2013, 18.75 hours for August 20, 2013, 17.25 hours for August 21, 2013, 17.50 hours for August 22, 2013, and 12 hours for August 23, 2014. (*Id*.)

be passed on to an opponent. *See Northcross v. Bd. of Educ. of Memphis City Sch.*, 611 F.2d 624, 636-37 (6th Cir. 1979) (holding that a district court may cut hours for duplication, padding or frivolous claims).

In fact, many of these time entries were so incredible that they call into question the accuracy or veracity of all of the entries contained within the billing sheets. For example, attorney Campinha-Bacote's claim that he spent 23 hours in trial and trial preparation on August 21, 2013 is highly improbable. Likewise, attorney Campinha-Bacote's entry of 2.75 hours for travel from his office in Columbus to Akron is suspicious. (Doc. No. 116 at 1217.) Using a GPS search engine, the Court has determined that such travel time would not have exceeded 2 hours.[18] The Court has no confidence that the billing statements presented by counsel are accurate or reasonable.

The Court's determination of the reasonableness of the number of hours expended prosecuting this case is further hampered by counsel's practice of using "block" entries to lump together multiple legal activities performed on the same day, making it virtually impossible to determine how much time was spent on any one activity.[19] *See Leviton Mfg. Co. v. Shanghai Meihao Elec., Inc.*, 613 F. Supp. 2d 670, 736 (D. Md. 2009) ("the use of block-billing introduces a level of unreliability in time entries

---

[18] Plaintiff has failed to demonstrate that *any* travel time is reasonably assessed to UJC. Plaintiff has not established that there were insufficient local competent attorneys capable of engaging in this type of employment litigation. *See generally Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995) (discussing the employment of an out-of-town specialist). While plaintiff is not seeking an enhanced rate for her out-of-town counsel, the Court notes that it has the discretion to reduce or eliminate travel time charged by out-of-town counsel. *See Anderson v. Wilson*, 357 F. Supp. 2d 991, 1000 (E.D. Ky. 2005) (cites omitted); *see, e.g., Pirolozzi v. Stanbro*, No. 5:07-CV-798, 2009 WL 3624919, at *6 (N.D. Ohio Oct. 29, 2009) (reducing travel time by out-of-town counsel because prevailing party did not justify retention of such counsel).

[19] Because of the block billing, it is unclear whether counsel overestimated their travel time on occasions other than the August 25, 2013 entry highlighted by the Court.

and thus less confidence in the documentation"), *vacated and remanded on other grounds by Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353 (Fed. Cir. 2010). Additionally, the Court has detected certain redundancies in the billing. Multiple attorneys have billed for the same inter-office communications. While the Court recognizes that time spent by counsel conferring "does not automatically constitute duplication of efforts[,]" *Sigley v. Kuhn*, 205 F.3d 1341, at *8 (6th Cir. 2000) (unpublished table decision), the billing sheets reflect that counsel double and triple billed for discussions regarding routine matters. Counsel also billed time for tasks, such as scheduling depositions, which were clearly clerical in nature. Courts have deducted from fee petitions for such deficiencies. *See, e.g., Lentz v. City of Cleveland*, No. 1:04 CV 669, 2011 WL 5360141, at *4 (N.D. Ohio Nov. 7, 2011) (reduction for clerical tasks performed by counsel); *Mason v. Maine Dep't of Corr.*, 387 F. Supp. 2d 57, 62 (D. Me. 2005) (reducing fee request for clerical work billed).

The Court could engage in a line-by-line review and reduction of the fees. The Court, instead, elects to the follow the lead of other courts that have applied an across-the-board reduction to account for excessive, redundant, and questionable entries. *See Auto Alliance Int'l, Inc. v. United States Customs Serv.*, 155 F. App'x 226, 228 (6th Cir. 2005) (approving of across-the-board approach to fee determination); *Schwarz v. Sec'y of Health & Human Serv.*, 73 F.3d 895, 906 (9th Cir. 1995) (across-the-board percentage cut is "a practical means of trimming the fat of a fee application") (quote omitted); *Ky. Rest. Concepts Inc. v. City of Louisville*, 117 F. App'x 415, 419 (6th Cir. 2004) (noting that while cutting a percentage of hours may appear "arbitrary," it is an "essentially fair approach"). The Court finds that a 50% reduction in hours claimed

36

"represents a fair and expeditious solution to determining the sum total of reasonable fees" that plaintiff has incurred in prosecuting her state-law retaliation claim. *Cobell v. Norton*, 407 F. Supp. 2d 140, 166 (D.D.C. 2005) (quote omitted); *see, e.g., Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 764-65 (N.D. Ohio 2010) (50% reduction for excessive billing and inadequate documentation); *Healthcall of Detroit, Inc. v. State Farm Mut. Auto. Ins. Co.*, 632 F. Supp. 2d 676, 685 (E.D. Mich. 2009) (40% reduction in fees to account for inadequate "summaries" of activities); *Tinch v. City of Dayton*, 199 F. Supp. 2d 758, 755-56 (S.D. Ohio 2002) (fee reduced by 30% to account for duplicative hours and vague and inconsistent entries). This reduction accounts for counsel's excessive and block billing, overstaffing, improvidently filed procedural motions, and the Court's overall lack of confidence in the accuracy and veracity of the billing records. Applying a 50% reduction in hours claimed to the hourly rates approved for counsel, the Court awards plaintiff's attorney's fees in the amount of $97,393.75.[20] The Court finds that this amount adequately recognizes the success counsel achieved for their client, while ensuring that the charged fees are not unreasonably excessive.[21] Therefore, plaintiff's motion for fees is GRANTED, in part.

---

[20]  The fees generated by attorney Dersham were calculated as follows: the 203.25 hours claimed by attorney Dersham were reduced by 50% (101.625) and multiplied by the hourly rate of $150, for a total of $15,243.75. The fees generated by attorneys Campinha-Bacote and Russell were calculated as follows: the 821.50 hours claimed by the pair were reduced by 50% (410.75) and multiplied by the hourly rate of $200, for a total of $82,150.00. Added together, the two amounts total $97,393.75.

[21] Given the fact that the Court has applied an across-the-board reduction to the requested fees, the Court finds that a further reduction—based upon consideration of the factors set forth in Ohio R. Prof. Cond. 1.5(a)—is unnecessary.

V.        **UJC'S MOTION TO STAY EXECUTION OF JUDGMENT**

Finally, UJC has moved, pursuant to Fed. R. Civ. P. 62(b), to stay execution of judgment. (Doc. No. 113.) Plaintiff has filed an opposition to the motion. (Doc. No. 114.) Rule 62(b) affords a court the option of staying proceedings to enforce a judgment while it considers certain post-trial motions. Having now resolved all of the pending post-trial motions, there is no need for a stay under Rule 62(b), and UJC's motion is DENIED as moot.

VI.       **CONCLUSION**

In accordance with the analysis set forth above:

(1)       UJC's motion to stay execution of judgment is DENIED as moot;

(2)       Plaintiff's motion for attorney's fees is GRANTED, in part, and plaintiff is awarded $97,393.75 in fees;

(3)       UJC's motion for remittitur is DENIED;

(4)       UJC's motion for JMOL or new trial is DENIED;

(5)       Plaintiff's motion to strike defendant's motion for JMOL or new trial is DENIED**;**

(6)       Plaintiff's motion to strike defendant's opposition to plaintiff's motion for attorney's fees is DENIED; and

(7)       UJC's motion to consider additional authority is GRANTED.

          **IT IS SO ORDERED**.

Dated: July 30, 2014

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

38